[No. H019427. Sixth Dist. Aug. 8, 2000.]

CITY OF SANTA CRUZ et al., Plaintiffs and Appellants, v.
PACIFIC GAS & ELECTRIC CO., Defendant and Respondent.

COUNSEL

Cotchett, Pitre & Simon, Frank M. Pitre, Nancy L. Fineman; Ruby & Schofield, Allen Ruby, Glen W. Schofield; Law Office of Paul Meltzer, Paul Meltzer and Rose Braz for Plaintiffs and Appellants.

Heller, Ehrman, White & McAuliffe, M. Laurence Popofsky, Kirk Werner; Hoge, Fenton, Jones & Appel, Charles H. Brock, Robert S. Luther; J. Michael Reidenbach; and Richard L. Meiss for Defendant and Respondent.

OPINION

ELIA, J.—The issue presented in this appeal is whether defendant Pacific Gas & Electric Co. (PG&E) has been underpaying 70 California cities for electric franchises, in violation of Public Utilities Code section 6231, subdivision (c).[1] The superior court found that in 70 cities of the 72-member class, PG&E had a "constitutional franchise" for lighting, which entitled it to pay a lower franchise fee to the plaintiff cities for nonlighting franchises. The court therefore granted PG&E summary judgment against these 70 class members. We find triable issues of fact as to 14 of the plaintiff cities and accordingly reverse the judgment in part.

---

[1] All further unspecified statutory references are to the Public Utilities Code.

*Background*

The central point of dispute in this class action is whether PG&E holds a constitutional franchise to supply light in the plaintiff cities. ▮▮▮ A franchise in this context is the right to use city streets to distribute electricity, gas, or water to the city and its inhabitants.[2] Normally the utility is charged a franchise fee as consideration for that privilege. (*County of Tulare v. City of Dinuba* (1922) 188 Cal. 664, 670 [206 P. 983].) No payment is required, however, for the exercise of a constitutional franchise.

Constitutional franchises are derived from article XI, section 19 of the California Constitution of 1879 (hereafter, article XI, section 19). As amended in 1884, article XI, section 19 stated as follows: "In any city where there are no public works owned and controlled by the municipality, for supplying the same with water or artificial light, any individual, or any company duly incorporated for such purpose under and by authority of the laws of this State, shall, under the direction of the Superintendent of Streets, or other officer in control thereof, and under such general regulations as the municipality may prescribe for damages and indemnity for damages, have the privilege of using the public streets and thoroughfares thereof, and of laying down pipes and conduits therein, and connections therewith, so far as may be necessary for introducing into and supplying such city and its inhabitants either with gaslight or other illuminating light, or with fresh water for domestic and all other purposes, upon the condition that the municipal government shall have the right to regulate the charges thereof."

This provision eliminated the system of governmental grants of franchises, which had led to favoritism and monopolies in derogation of free competition. (See *Stockton Gas etc. Co. v. San Joaquin Co.* (1905) 148 Cal. 313, 318 [83 P. 54]; *Russell v. Sebastian* (1914) 233 U.S. 195, 206 [34 S.Ct. 517, 520, 58 L.Ed. 912].) It allowed *any* person or company to supply water or artificial light to a city[3] without approval by legislative or municipal officers. All that was required for the grant to be effective was acceptance by the provider—that is, the actual installation of the pipes, conduits and poles necessary to perform the service. (*Stockton Gas etc. Co. v. San Joaquin Co.*, *supra*, 148 Cal. 313, 318.) The franchise then constituted a valid contract with the state, which conferred upon the person or company a protected

---

[2] A franchise has been defined as "a privilege conferred upon an individual or a corporation for use of a sovereign body's property." (*Southern Pacific Pipe Lines, Inc. v. City of Long Beach* (1988) 204 Cal.App.3d 660, 666 [251 Cal.Rptr. 411]; see also *City of Oakland v. Hogan* (1940) 41 Cal.App.2d 333, 346 [106 P.2d 987] [franchise is a special privilege conferred upon a corporation or individual by a government legally empowered to grant it].)

[3] The city must not have already had its own artificial lighting system for the provision to apply.

property right. (*Russell v. Sebastian, supra,* 233 U.S. at p. 204 [34 S.Ct. at p. 519].) On October 10, 1911, the Constitution was amended to eliminate the constitutional franchise, but the amendment did not impair the rights of any utility that had already undertaken to use the streets to supply light or water to a city. (*Id.* at p. 210 [34 S.Ct. at p. 522].) Thus, once acquired, no fee could thereafter be imposed for its continuous exercise to the extent that it was used to provide light or water.

However, the same poles and wires that carried electricity for lighting supplied electricity for other uses such as heat and cooking. For these other purposes, holders of constitutional franchises entered into agreements with cities for "complementary" franchises, which required them to pay a fee for the privilege of using city streets to provide gas or electricity for uses other than light.

On March 22, 1905, the Legislature enacted the Broughton Act, which established procedures for granting nonconstitutional franchises and devised a formula for computing complementary franchise fees based on receipts attributable to the use of the franchise. (Stats. 1905, ch. 578, pp. 777-780; see § 6001 et seq.) According to this formula, a public entity could charge the utility 2 percent of the utility's gross annual receipts "arising from [the] use, operation, or possession" of the franchise. (Stats. 1905, ch. 578, § 3, p. 779; see § 6006.)

The segregation of receipts for lighting, which required no payment, from other uses presented practical accounting problems in the application of the formula. (See *Los Angeles County v. Southern Counties Gas Co. of Cal.* (1954) 42 Cal.2d 129, 132 [266 P.2d 27]; *County of Tulare v. City of Dinuba, supra,* 188 Cal. 664, 672.) In 1937 an alternative scheme took effect as the Franchise Act of 1937, now set forth in section 6201 et seq. (See generally *County of Alameda v. Pacific, Gas & Electric Co.* (1997) 51 Cal.App.4th 1691, 1695 [60 Cal.Rptr.2d 187].)

Section 6231, subdivision (c), recognizes constitutional franchises in prescribing the formula for calculating franchise fees. If a utility holds a constitutional franchise, the fee for the complementary franchise is the greater of the Broughton Act formula (2 percent of its gross annual revenues "arising from the use, operation, or possession of the franchise" [§ 6006]) or *.05 percent* of its gross annual receipts. If the utility does not hold a constitutional franchise, then it must pay according to the Broughton Act

formula or 1 percent of its gross annual receipts, whichever is greater.[4] Eventually the Broughton Act formula yielded to the 1 percent/0.5 percent formula, which generated a higher fee. (*County of Alameda v. Pacific, Gas & Electric Co.*, *supra*, 51 Cal.App.4th 1691, 1695.)

Beginning in 1938, many cities throughout California enacted nearly identical ordinances granting complementary electric franchises to public utilities under the Franchise Act of 1937. Each ordinance typically recited an understanding that the grantee held a constitutional franchise in that city, thus recognizing the exemption from fees for the grantee's provision of lighting.

## Procedural History

In May 1994 the City of Santa Cruz filed this class action, alleging that PG&E had been deliberately underpaying franchise fees to 107 of the 228 cities in its service area. According to plaintiffs, they had accepted PG&E's representation that the utility held a constitutional franchise for light, thereby entitling it to pay the lower "complementary" fee for its electric franchise. In fact, plaintiffs claimed, PG&E did not hold such a constitutional franchise and therefore was required to pay the amount required by statute for a noncomplementary franchise. The differential fee structure, argued plaintiffs, violated section 453, subdivisions (a) and (c),[5] and section 6231, subdivision (c). Plaintiffs also claimed breach of contract and breach of the implied covenant of good faith and fair dealing, and they sought damages, a constructive trust, declaratory relief, and an accounting.

On June 1, 1995, PG&E moved for class decertification and for summary judgment against City of Santa Cruz as class representative. PG&E argued that it could not be liable for unlawful discrimination under section 453 because (1) recitals in the Santa Cruz ordinance created a conclusive presumption that PG&E held a valid constitutional franchise in that city; and (2)

---

[4]More specifically, once a utility's application for a franchise is accepted, it is required to pay the municipality "during the life of the franchise 2 percent of the [utility's] gross annual receipts arising from the use, operation, or possession of the franchise, except that this payment shall be not less than 1 percent of the [utility's] gross annual receipts derived from the sale within the limits of the municipality of the utility service for which the franchise is awarded." (§ 6231, subd. (c).) If the franchise is "complementary" to a constitutional franchise, however, the amount of the fee is "2 percent of the [utility's] gross annual receipts arising from the use, operation, or possession of the franchise, except that this payment shall be not less than one-half of 1 percent of the [utility's] gross annual receipts from the sale of electricity within the limits of the municipality under both the electric franchises . . . ." (§ 6231, subd. (c).)

[5]Section 453, subdivision (a), prohibits utilities from granting preferences to or discriminating against "any corporation or person" with respect to rates or service. Subdivision (c) proscribes unreasonable differences in rates or service between localities or classes of service.

it was merely complying with section 6231 in paying the complementary rate. PG&E also argued that plaintiffs' claims were barred by the statute of limitations, estoppel, waiver, and laches.

On September 1, 1995, Judge Robert B. Yonts of the Santa Cruz County Superior Court denied PG&E's motions, finding a common issue among class members and a triable issue of fact as to whether a constitutional franchise ever existed in the City of Santa Cruz. In a more detailed order filed November 22, 1995, Judge Yonts again denied the motions. The court rejected PG&E's assertion of a conclusive presumption of a constitutional franchise based on the city's ordinance, and it found no evidence that the city had known that PG&E lacked a constitutional franchise, thus vitiating PG&E's claims of waiver and estoppel. Finally, the court noted that each allegedly inadequate payment constituted a separate act; consequently, for those payments made within the applicable statutory period, neither the doctrine of laches nor the statute of limitations barred the city's claims.

On January 12, 1996, Judge Yonts granted PG&E's motion for reconsideration but affirmed the order denying summary judgment. PG&E thereafter petitioned for a writ of mandate, which this court denied on January 23, 1996.

On November 22, 1995, PG&E again moved for summary judgment, this time against five individual class cities. In March 1996 it moved for judgment on the pleadings as to 31 charter cities. PG&E's motions were heard by Judge Samuel S. Stevens. In its written order filed February 15, 1996, the court granted summary judgment on the ground that it was undisputed that PG&E held constitutional franchises in the five cities, and their ordinances provided for fee payment according to the formula prescribed for complementary franchises. As to the motion for judgment on the pleadings, the court again ruled in PG&E's favor, reasoning that charter cities were bound by the terms of their franchises.[6] This court affirmed both the summary judgment and the judgment on the pleadings on September 8, 1997.

On April 7, 1998, PG&E filed a third summary judgment motion pertaining to the remaining 72 class cities. The defendant again asserted the untimeliness of plaintiffs' position, invoking waiver, estoppel, and all conceivably applicable statutes of limitations. PG&E also renewed its claim that the Franchise Act ordinances alone were sufficient, if not conclusive, evidence of the constitutional franchise owned by PG&E. Alternatively, PG&E attempted to establish in each city the chain of title evincing a constitutional franchise held by one entity and passed on by successive transfers to PG&E.

---

[6]One of the cities affected by this judgment was the City of Santa Cruz. That city is therefore not before us in this appeal.

At the hearing on the new motion Judge Stevens refused to revisit the procedural issues on which Judge Yonts had already ruled. Instead, turning to the central issue of whether PG&E held constitutional franchises, Judge Stevens expressed the tentative conclusion that there was "substantial evidence" of such franchises in 70 of the 72 cities. In the remaining two cities—Blue Lake and Point Arena—the court found "substantial evidence that the constitutional franchise was not transferred" to PG&E. Accordingly except as to Blue Lake and Point Arena, the court granted the motion and entered judgment for PG&E.

*Discussion*

1. *Scope and Standard of Review*

The parties acknowledge the applicable principles governing determination of summary judgment motions. Summary judgment is proper when there is no triable issue of material fact and the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).) ■ A defendant making the motion has the initial burden of affirmatively showing that one or more elements of the cause of action cannot be established or that there is a complete defense to that cause of action. (Code Civ. Proc., § 437c, subd. (o)(2); *Addy v. Bliss & Glennon* (1996) 44 Cal.App.4th 205, 214 [51 Cal.Rptr.2d 642]; *Sanchez v. Swinerton & Walberg Co.* (1996) 47 Cal.App.4th 1461, 1465 [55 Cal.Rptr.2d 415].) If the moving papers establish a prima facie showing that justifies a judgment, the burden then shifts to the plaintiff to demonstrate the existence of a material factual issue. (*Addy v. Bliss & Glennon, supra,* 44 Cal.App.4th at p. 213; *Lopez v. Superior Court* (1996) 45 Cal.App.4th 705, 713 [52 Cal.Rptr.2d 821].) On appeal, the reviewing court exercises its independent judgment, deciding whether the moving party has established undisputed facts that negate the opposing party's claim or state a complete defense. (*Addy v. Bliss & Glennon, supra,* 44 Cal.App.4th at p. 214; *Romano v. Rockwell Internat., Inc.* (1996) 14 Cal.4th 479, 487 [59 Cal.Rptr.2d 20, 926 P.2d 1114].)[7]

The defendant's papers are strictly construed, while the plaintiff's papers are liberally construed, and the court must be convinced that " 'under no possible hypothesis within the reasonable purview of the allegations of the complaint is there a material question of fact which requires examination by trial.' " (*Sanchez v. Swinerton & Walberg Co., supra,* 47 Cal.App.4th at p. 1465, quoting *Chevron U.S.A., Inc. v. Superior Court* (1992) 4 Cal.App.4th

---

[7]Because this court's review is de novo, it is unnecessary to address plaintiffs' argument that the superior court's use of the term "substantial evidence" indicates an impermissible weighing of evidence in deciding the summary judgment motion.

544, 548 [5 Cal.Rptr.2d 674].) If the defendant fails to meet this burden, it is unnecessary to examine the plaintiff's opposing evidence; the motion must be denied. (*Ibid.*) We regard facts as undisputed only if they are not contradicted by the opposing party's evidence. (*Soderberg v. McKinney* (1996) 44 Cal.App.4th 1760, 1764 [52 Cal.Rptr.2d 635].) Any doubts are resolved against the moving party. (*Id.* at p. 1765.)

## 2. *Evidentiary Preclusion*

We first consider PG&E's assertions that plaintiffs' silence over the decades and the parties' assumption that PG&E had a constitutional franchise preclude an action based on contrary facts. More specifically, PG&E contends that plaintiffs' action is barred by Evidence Code section 622, by the statute of limitations, and by the doctrines of waiver and contractual estoppel. If correct, these theories would entitle PG&E to judgment independently of any factual disputes regarding the violation of section 6231, subdivision (c).

### a. *Estoppel*

■ Evidence Code section 622 provides: "The facts recited in a written instrument are conclusively presumed to be true as between the parties thereto, or their successors in interest; but this rule does not apply to the recital of a consideration." The application of this provision, a codification of the doctrine of "estoppel by contract," is based on the principle that parties who have expressed their mutual assent are bound by the contents of the instrument they have signed, and may not thereafter claim that its provisions do not express their intentions or understanding. (See *Estate of Wilson* (1976) 64 Cal.App.3d 786, 801-802 [134 Cal.Rptr. 749].) ■ PG&E invokes Evidence Code section 622 in noting that the ordinances passed under the Franchise Act of 1937 included statements that PG&E held constitutional franchises in those cities. According to PG&E, those "factual determinations" must be conclusively presumed to be true. Because plaintiffs "chose" to enter into these complementary franchise agreements, PG&E argues, they are bound by the recitals of the existence of the constitutional franchise, on which the lower franchise fee is premised.

PG&E's theory is inapplicable in the procedural circumstances presented here. This is not a situation involving arm's length negotiations marked by the opportunity of both sides "to accept, reject, or modify the terms of the agreement," as PG&E asserts. A complementary franchise is contractual only in the sense that the parties mutually agree to enter into the franchise relationship; it is offered "on a take-it-or-leave-it basis." (*County of Alameda*

*v. Pacific Gas & Electric Co., supra,* 51 Cal.App.4th at p. 1696, fn. 3.) Terms of the ordinance such as the franchise fee are dictated by the Legislature, and the factual predicate of those terms is defined by the status of the franchisee under article XI, section 19 of the 1879 Constitution. (*County of Sacramento v. Pacific Gas & Elec. Co.* (1987) 193 Cal.App.3d 300, 308, fn. 5 [238 Cal.Rptr. 305].)

Furthermore, contractual estoppel based on factual recitations in an instrument is inapplicable to the extent that the agreement is void. Even if the statement that PG&E has a constitutional franchise is viewed as a declaration necessary to the enactment of the ordinance, the ordinance is invalid if it establishes a right in PG&E contrary to state law. (Cf. *Garamendi v. Mission Ins. Co.* (1993) 15 Cal.App.4th 1277, 1288-1289 [19 Cal.Rptr.2d 190].) ■ "The general rule is that estoppels will not be invoked against the government or its agencies except in rare and unusual circumstances . . . . In no event will such estoppel operate where the act or contract relied on to create the estoppel is outside the corporate powers of the governmental agencies or officials." (*Wheeler v. City of Santa Ana* (1947) 81 Cal.App.2d 811, 817 [185 P.2d 373].) Just as a city cannot rely on estoppel in defense of its invalid restrictions on a constitutional franchise (see, e.g., *Town of St. Helena v. Ewer* (1914) 26 Cal.App. 191, 197 [146 P. 191]; *City of Arcata v. Green* (1909) 156 Cal. 759, 764 [106 P. 86]), the doctrine is equally unavailable when the shoe is on the other foot. ■ Here PG&E is seeking to use estoppel to compensate for the alleged invalidity of ordinances under state law. If PG&E in fact has no constitutional franchise in the plaintiff cities, the lower franchise fee it has been paying is contrary to state law and in derogation of the public good. "We do not favor the doctrine of acquiescence, or estoppel, as applied to a situation of this kind. There is much respectable authority holding that public officials and public agencies cannot alienate public rights by mere failure to assert such rights in behalf of the public which they represent." (*Terminal Rys. v. County of Alameda* (1924) 66 Cal.App. 77, 83 [225 P. 304].)

PG&E also relies on *Porter v. City of Riverside* (1968) 261 Cal.App.2d 832 [68 Cal.Rptr. 313], which involved an ordinance authorizing reimbursement of out-of-pocket expenses for city council members. The ordinance recited that inflation and other demands had resulted in an increase in these expenses, and that $350 per month represented a reasonable amount of monthly expenses. The ordinance therefore provided for a monthly expense allowance of that amount without requiring the council members to present an expense claim. The trial court determined that the allowance exceeded actual expenses and therefore constituted compensation, in violation of the city's charter. The appellate court reversed, noting the presumption of

validity applicable to statutes and ordinances. By receiving evidence and making findings contrary to the declaration of facts in the ordinance, the trial court had exceeded its powers. (*Id.* at pp. 836-837.)

According to PG&E, the *Porter* holding compels an analogous result here, that the ordinances at issue must be presumed to be valid by "conclusively deem[ing]" recitals of fact to be true. We disagree. This is not a case in which "the *right* to enact a law depends upon the existence of a fact," as in *Porter.* (*Porter v. City of Riverside, supra,* 261 Cal.App.2d at p. 836, italics added.) The ordinances at issue here were based on factual *assumptions,* not formal findings of fact on which the power to enact them depended.

Thus, neither *Porter* nor Evidence Code section 622 supports the application of a conclusive presumption in these procedural circumstances. We therefore agree with the superior court that the question of whether PG&E held a constitutional franchise was not conclusively determined by factual assumptions reflected in the ordinances, but those assumptions were nonetheless relevant evidence on that issue.

### b.   *Statute of Limitations*

■   PG&E also contends that plaintiffs' "extraordinary delay" in bringing this action bars their claim under any applicable statute of limitations.[8] According to PG&E, the complaint is tantamount to a claim for rescission, based on the cities' mistake in agreeing that PG&E had a constitutional franchise. Any cause of action based on mistake accrued at the time PG&E accepted the franchise ordinance, it argues, and plaintiffs failed to provide evidence justifying a tolling defense based on their claimed recent discovery of the facts. Instead, what was discovered was not new facts but a new legal theory enabling them to invalidate and rewrite the ordinances. In any event, PG&E concludes, plaintiffs should be charged with knowledge of the facts they would have discovered through diligent inquiry.

In ruling on PG&E's first motion for summary judgment, Judge Yonts determined that plaintiffs' claims accrued upon each underpayment of fees. This ruling finds support in case law. In *City of Los Angeles v. Belridge Oil Co.* (1954) 42 Cal.2d 823, 834 [271 P.2d 5], the court noted that the three-year limitations period applicable to liability created by statute (presently Code of Civil Procedure section 338, subdivision (a)) "runs from the time the cause of action accrues, and the cause of action accrues when the tax becomes delinquent."

---

[8]PG&E argues the claim is precluded whether it is controlled by a three-year or four-year limitations period. (See Code Civ. Proc., §§ 337 [four years for breach of contract], 338 [three years for statutory liability], and 343 [four years for wrong not otherwise specified].)

*Tehama v. Pacific Gas & Elec. Co.* (1939) 33 Cal.App.2d 465, 474 [91 P.2d 936], on which PG&E relies, is distinguishable. In that case PG&E operated a franchise for 22 years without making any required payments of franchise taxes and without any demand for payment by the county. The court in dicta noted that the action was barred by the applicable statute of limitations. However, there was no representation by PG&E that it was acting properly; it simply failed to make the required payments and the county failed to demand them. In this case, according to the complaint, plaintiffs accepted the lower franchise fee each year upon PG&E'S representation, under penalty of perjury, that it had paid the amounts it owed.[9]

The same distinction applies to *City of L.A. v. County of L.A.* (1937) 9 Cal.2d 624 [72 P.2d 138, 113 A.L.R. 370], where a railway corporation made payments to the county rather than the city over a period exceeding 15 years without objection or demand by the city. As to the corporation, the city's claims were barred by laches and estoppel, since the city had impliedly represented that it would not require payment as long as the corporation paid the county. As to its claim against the county, however, the city was not barred from recovering those amounts payable within the applicable statute of limitations period. Here, plaintiffs allege, PG&E annually represented under oath that its payments were correct. Their failure to challenge the payments resulted not simply from inaction, as in *City of L.A. v. County of L.A.*, but from their reliance on an affirmative misrepresentation by PG&E. Thus, Judge Yonts did not err in determining that a cause of action accrued with each of these annual statements.

c.  *Waiver*

As the parties recognize, waiver is "the intentional relinquishment or abandonment of a known right." (*Bickel v. City of Piedmont* (1997) 16 Cal.4th 1040, 1048 [68 Cal.Rptr.2d 758, 946 P.2d 427] (abrogated by statute with regard to construction of the Permit Streamlining Act [Stats.1998, ch. 283, § 5]).) A party "may waive a statutory provision if a statute does not prohibit doing so (16 Cal.4th at pp. 1048-1049, fn. 4), the statute's 'public benefit . . . is merely incidental to [its] primary purpose' (*id.* at p. 1049), and 'waiver does not seriously compromise any public purpose that [the statute was] intended to serve' (*id.* at p. 1050)." (*DeBerard Properties, Ltd. v. Lim* (1999) 20 Cal.4th 659, 668-669 [85 Cal.Rptr.2d 292, 976 P.2d 843].)

As Judge Yonts found, these criteria are not met in the instant case. Here it is not a private party that is subject to waiver, as in *Bickel* and *DeBerard*

---

[9] Plaintiffs also suggest fraudulent concealment by PG&E of the facts on which its causes of action depend, thus tolling the limitations period by estoppel.

*Properties*, but a public entity. The public benefit in franchise fees is obviously central to the purpose of section 6231, subdivision (c), and that benefit would unquestionably be compromised by applying the waiver doctrine to the plaintiff cities. Furthermore, for waiver to be effective, there must be an actual intention to relinquish the right based on knowledge of the underlying facts. (*Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 31 [44 Cal.Rptr.2d 370, 900 P.2d 619]; *DRG/Beverly Hills, Ltd. v. Chopstix Dim Sum Cafe & Takeout III, Ltd.* (1994) 30 Cal.App.4th 54, 60 [35 Cal.Rptr.2d 515].) Although waiver need not be express, an implied waiver must nonetheless be based on conduct indicating an intention to relinquish the right. (*Waller v. Truck Ins. Exchange, Inc., supra*, 11 Cal.4th at p. 31.) This is a question of fact requiring clear and convincing evidence, which is not established as a matter of law by PG&E's moving papers.

### 3. *Sufficiency of PG&E's Showing*

We next address the evidence offered by PG&E in support of its summary judgment motion, to ascertain whether the undisputed facts and reasonable inferences therefrom establish PG&E's right to judgment as a matter of law. The superior court found that a triable issue of fact existed in only two cities, where there was an insufficient showing that a constitutional franchise was transferred to PG&E by its predecessors. In our de novo review, and resolving all doubts in favor of plaintiffs, as we must, we find a triable issue of fact as to whether PG&E holds a constitutional franchise in 14 of the 70 remaining cities.

### a. *Preliminary Assumptions*

This court's determination of the motion is premised on certain assumptions regarding the nature of a constitutional franchise and its effective transfer. ■■■ First, the acquisition of such a franchise should be distinguished from the supply of lights and service. The privilege granted in article XI, section 19 was that of using the public streets *and* of laying conduits and connections as was necessary to introduce and supply light to the city. Thus, if a utility used city streets to provide lighting before October 10, 1911, that company had a constitutional franchise regardless of who initially erected the poles and wires for that purpose.

■■■ Secondly, we do not regard the recital of a constitutional franchise alone as sufficient to shift the burden to plaintiffs. PG&E's applications for complementary franchises under the Franchise Act of 1937 were completely standardized, as were the resulting ordinances. PG&E's argument that the franchise ordinances are "sufficient in and of themselves" is only a variation

on the theme of conclusive presumptions, which we have already rejected for purposes of summary judgment. Instead, it is necessary to examine the evidence offered by PG&E in support of its assertion that the chain of title in each city demonstrates its acquisition of a constitutional franchise from its predecessors.

An essential ingredient of this chain-of-title evidence is an effective transfer from the owner of a constitutional franchise. We reject plaintiffs' contention that a conveyance from the owner of a constitutional franchise must specifically identify the nature of the franchise. Where the transfer documents convey "all franchises" we may infer an intent to transfer any constitutional franchise possessed by the grantor.

We do agree with plaintiffs that certain transfers required government approval to be valid. As part of the October 10, 1911 amendment to the Constitution, section 22 created a Railroad Commission, and section 23 subjected public utilities to the control of and regulation by the commission. The Public Utilities Act of 1911, which implemented the new constitutional provision, took effect on March 23, 1912. Under section 51 of the act, the assignment of a franchise required authorization by the Railroad Commission.[10] (Stats. 1911, ch. 14, § 51, p. 44.) *Before* March 23, 1912, however, approval by two-thirds of the stockholders of a granting corporation was sufficient for an effective conveyance of the grantor's entire property, including franchises, to another corporation. (Former Civ. Code § 361a [Stats. 1903, ch. 271, § 1, p. 396]; *South Pasadena v. Pasadena Land etc. Co.* (1908) 152 Cal. 579, 584-586 [93 P. 490].)

We must also address plaintiffs' assertion that a person or company did not have a constitutional franchise if the city granted a franchise for a term of years or in consideration of the grantee's payment of money. In several cities, a board of trustees passed an ordinance expressly granting an electrical franchise to an individual or company, often the "highest bidder" (e.g., Emeryville, San Juan Bautista, Cloverdale). These franchises were to last a finite period such as 15 years (Benicia), 25 years (Suisun City) or 50 years (Fort Bragg, Sebastopol). Because the franchises were not "free and perpetual," they could not, according to plaintiffs, be constitutional franchises.

■ This argument cannot succeed. Whoever received a franchise for lighting a city before the adoption of the October 10, 1911 amendment acquired a vested right that could not be impaired by legislative or municipal acts. Thus, any requirement of payment for this privilege or limitation on its

---

[10]This provision is now contained in section 851. The requisite approval is made by the Public Utilities Commission.

duration was an invalid restriction. (See *Oakland v. Great Western Power Co., supra*, 186 Cal.570, 581-583; *Suisun City v. Pacific Gas etc. Co.* (1917) 35 Cal.App. 380, 381 [170 P. 1078]; *Town of St. Helena v. Ewer, supra*, 26 Cal.App. 191, 197.)

Finally, it is necessary to clarify the nature of the privilege held by a service provider that operates under a franchise originating in a grant by a county board of supervisors. The issue, which the parties have addressed in supplemental briefs, is whether a county franchise may give rise to a constitutional franchise once the area in use becomes part of an incorporated city. Plaintiffs contend that a grant of a lighting franchise by a county precluded acquisition of a new franchise from the state. Once incorporated, plaintiffs argue, both the city and the utility were bound by the terms of any franchises already in existence. Since the pipes and conduits were already laid in those cities, no new franchise could be acquired.

PG&E, however, contends that upon incorporation of the city a utility acquired a constitutional right which superseded any preexisting county franchise to the extent that the franchises were inconsistent. Thus, if a utility had already begun installation or service when a city incorporated, it acquired a constitutional franchise upon the city's incorporation, as long as the incorporation occurred before October 10, 1911 (as is the case in each of the plaintiff cities).

PG&E offers the better argument. Article XI, section 19 applies to *any* individual or *any* company, and the privilege encompasses not only the initial "laying down" of poles and wires in the streets but also, more broadly, the "using" of the streets to supply light. The purpose of the provision, to promote free competition, would not be served by restricting the privilege to newcomers. Thus, on the day of incorporation, every service provider, including any company already in operation through a county franchise, was entitled to avail itself of article XI, section 19 and thereby acquire a constitutional franchise in the new city.

With these legal assumptions guiding our review of the chain-of-title evidence, we proceed to determine whether PG&E met its burden of showing that it had a constitutional franchise in each city and was therefore entitled to judgment as a matter of law. The first question is whether PG&E or its predecessor used the streets of each city to supply it with lighting. If it was a predecessor who was so engaged, it is necessary also to determine whether the transfer of the lighting franchise from the predecessor to PG&E was valid.

b. *History of Electrical Service in Each City*

In Auburn, King City, Livermore, St. Helena, Pinole, Rocklin, Selma, Lemoore, Fowler, Santa Maria, Nevada City, Yuba City, Lincoln, Rio Vista, Hollister, Antioch, Concord, Calistoga, and Sonora, the existence of a constitutional franchise is shown by the minutes of the board of trustees meetings in which the board approved payment of claims for "lights," "street lights," "electric lights," or "lighting." These billing statements pertain to service provided before October 10, 1911, and are therefore sufficient to satisfy PG&E's initial burden of showing that the service provider was using the streets and thoroughfares of the city to supply the city with light. If there was rebuttal evidence that the privilege to do so was not a constitutional franchise, it was incumbent upon plaintiffs to offer that evidence in order to raise a triable issue of fact.

Plaintiffs did offer such evidence with respect to Lemoore. Article XI, section 19 did not apply to any city in which there were "public works owned and controlled by the municipality, for supplying the same with . . . artificial light." (Art. XI, § 19.) In August 1902 the Lemoore Board of Trustees passed an ordinance setting the rates it intended to charge residents and businesses for electric lights. The ordinance specifically referred to the electric light poles and wires belonging to the city. In 1910, the board approved payment of bills from PG&E's predecessor, San Joaquin Light & Power Co., for "street lights" and for a "street lighting system." San Joaquin Light & Power Co. thus may have acquired a lighting franchise while there was already a municipal electric distribution system in place. We conclude, therefore, that plaintiffs have presented a triable issue of fact as to whether article XI, section 19 applied to the city of Lemoore.

In Coalinga the minutes do not identify the purpose of the bill from the Coalinga Water & Electric Co., but they do report extensive discussions about the lights and lighting service provided by the company. This is sufficient to shift the burden to plaintiffs. Similarly, in a January 1909 board of trustees meeting in Larkspur, the board discussed the need for changes in the location of street lights and resolved to request action by PG&E on the decision. This evidence is sufficient to show that PG&E was providing lighting service to Larkspur during the constitutional period. It was plaintiffs' burden to meet this showing with evidence raising a triable issue of fact. On the other hand, in Sausalito, Vacaville, Fortuna, Paso Robles, and Colusa, the minutes in which the authorization of bill payment is recorded do not identify the purpose of the claim as being for lighting, nor are there

board discussions regarding lighting service actually provided by the claimant. In these cities a question of fact remains as to the nature of the franchise held by PG&E or its predecessors.[11]

In some cities there is more direct evidence of a pre-1911 lighting contract or franchise granted by the board of trustees to a specific individual or company. In Jackson, Fort Bragg, Los Gatos, Sebastopol, Benicia, Placerville, Kingsburg, Orland, Red Bluff, Willows, Suisun City, Belvedere, Burlingame, San Anselmo, Woodland, Dixon, Wheatland, Winters, Morgan Hill, San Juan Bautista, Antioch, Martinez, Cloverdale, Lakeport, Sonoma, and Emeryville, the board of trustees authorized the provider to install or maintain a lighting system or to furnish lights.

With three exceptions, in each of these cities where a franchise was awarded by contract or ordinance, there is evidence of the grantee's acceptance of the privilege by supplying light to the city. In Sebastopol, Benicia, Willows, Orland, Burlingame, Wheatland, Winters, Antioch, San Juan Bautista, and Lakeport, the minutes of the board of trustees meetings reflect the board's payment of claims for lights or lighting by the service provider.[12] In other cities[13] there is evidence of acceptance in the documents executed in the course of transferring the assets (including franchises) of the grantee to the next utility in the chain of title.

The evidence provided to show acceptance of a lighting franchise is insufficient for summary judgment in three of these cities, however. In Red Bluff the board granted a 50-year franchise to Sacramento Valley Power Co. to erect and maintain poles and wires for electric power "for the various purposes for which the same may be used." We may infer that this franchise included lighting, but the record does not indicate whether the utility exercised its franchise to provide an electrical system for light or for some other

[11]Moreover, in Vacaville, the sale of the Vacaville Water & Light Company (the payee listed in the city treasurer's cash book) to the Vacaville Water & Power Company occurred after the former company "ceased to exist" due to the expiration of its corporate charter.

[12]There are also claims approved in Los Gatos, Kingsburg, Belvedere, San Anselmo, and Cloverdale, but they do not specify that the bill is for lighting. Nevertheless, in these cities (1) the minutes do not indicate that any other provider was supplying light, and (2) there is additional evidence that the franchisee supplied light in subsequent documents transferring the franchise to the next provider in the chain of title. Thus, we may infer that the grantee of the franchise actually supplied light pursuant to the authorizing ordinance or contract.

[13]These transfer documents, including deeds and written findings by the Railroad Commission, reflect a lighting distribution system or service by the grantee in Los Gatos, Benicia, Kingsburg, Belvedere, Burlingame, and Lakeport. In Fort Bragg, Sebastopol, Placerville, Willows, Suisun City, Woodland, Dixon, Wheatland, Winters, Martinez, and Cloverdale, the transfer documents from the grantee to its successor specifically identified the franchise awarded to the grantee. In San Anselmo and Burlingame PG&E itself received a pre-1911 lighting franchise.

use. In Sonoma, the board granted C.T. Ryland a franchise to supply the city with light. The board subsequently approved payment of lighting bills from Sonoma Valley Co., but there is no apparent connection between that company and C.T. Ryland. The assignment from Ryland to his successor (California Telephone and Light Company, the immediate predecessor of PG&E) only referred generally to his electric light and power plant and his business of selling electric light in Sonoma County. Without more, there remains a question of fact as to whether Ryland exercised his franchise to provide light to the City of Sonoma. Finally, in Emeryville, an October 1910 ordinance granted Great Western Power Co. a franchise to transmit electricity for *heat and power*. The ordinance did include a provision that upon demand the company shall sell available electricity for lighting; but the record contains no evidence that Great Western Power Co. actually supplied electricity to the town for lighting purposes before October 10, 1911.

In two cities the evidence of a contract is inadequate to establish its nature as a lighting franchise. In Dinuba, the board minutes do not specify the nature of either the contract awarded to San Joaquin Light & Power Company or the ensuing bills from the company. No other evidence denotes a lighting franchise in San Joaquin Light & Power Company or its successor, San Joaquin Light & Power Corporation. Similarly, in Los Banos the board of trustees authorized San Joaquin Light & Power Co. to "install poles and wires," but there is no mention of the purpose of the proposed installation, and no indication that the utility accepted the franchise by October 10, 1911, six days later.[14]

■ For each city in which a constitutional franchise was established by evidence of lighting service through bill payment or express grant, there is evidence of an effective transfer to the next utility in the chain of title. We have already rejected plaintiffs' argument that the conveyances were invalid for failing to identify *constitutional* franchises in the transfer or for failing to obtain governmental approval. The chain of title has been established for summary judgment purposes even where "all franchises" were generally conveyed, and in each corporate conveyance that took place before March 23, 1912, two-thirds of the stockholders approved the transaction.

---

[14]The conveyance from Miller & Lux to San Joaquin Light & Power Co. is also insufficient to establish the latter's constitutional franchise in Los Banos. First, there is no evidence that Miller & Lux supplied light to the city. In July 1910 the board granted Miller & Lux permission to build a fireproof warehouse at a specified location, and it instructed the clerk to have Miller and Lux "remove all poles and electric wires not in use" in the city. The board also told the clerk that day to ask PG&E how soon it could begin work on its line; if PG&E could not complete the work by winter, the board would have to make other arrangements for light for the winter. In September 1911 Miller & Lux conveyed some land and its appurtenances, but there is no mention of franchises whatsoever. There is one claim from Miller & Lux for an unspecified purpose, which was approved for payment on October 4, 1911.

Several cities incorporated when PG&E's predecessor was already providing lighting service to the occupants through a county franchise. Prior to the incorporation of Arroyo Grande, Newman, Pinole, South San Francisco, Colfax, Tracy,[15] Oakdale, Madera,[16] Taft, Maricopa, Corning, Orland, Tehama, Fairfield,[17] Burlingame, and Hillsborough, the applicable county board of Supervisors passed an ordinance granting a lighting franchise to an individual or company.[18] In Daly City the board of trustees discussed the unsatisfactory lighting service provided by the South San Francisco Power & Light Company and decided to inform the board of supervisors of the company's inadequate performance of its contract.[19] In each of these cities there is affirmative evidence of an effective conveyance of the service provider's franchises to the next utility in the chain of title. Accordingly, we may infer that PG&E retained the constitutional franchise that was acquired on the city's incorporation date. Plaintiffs did not offer evidence to rebut such an inference.

In Arcata, Ferndale, and Sanger PG&E relied on evidence of franchises other than bill payments or express grants from the city or county. While there is indirect evidence of lighting service in these cities, it does not establish a constitutional franchise as a matter of law. The only evidence offered for Arcata (aside from the assumption made in the 1960 Franchise Act ordinance) is a conveyance on August 4, 1911, from the Arcata Light &

---

[15]PG&E's moving papers did not include the actual documents evidencing the assignment from the original grantee to Mt. Diablo Light & Power Co. (Mt. Diablo) or from the latter to its successor, Sierra & San Francisco Power Co. (Sierra). It initially appears, therefore, that evidence of the requisite approval was absent in PG&E's showing. However, Mt. Diablo itself provided lighting service during the constitutional period, and the minutes of the board of supervisors meeting on March 4, 1912, recite that the assignment of the franchise from Mt. Diablo to Sierra was "duly signed and approved."

Minutes of the city's board of trustees meeting in September 1911 mention locating all the "[e]lectric light poles belonging to the city." If Tracy maintained its own public lighting works during the constitutional period, a private supplier could not thereafter have acquired a constitutional franchise. Plaintiffs do not make this argument as to Tracy, however.

[16]Plaintiffs do not mention a county franchise applicable to Madera, though there is evidence of a lighting contract between the utility and the county in the board's discussion of rates for arc lights. Whether or not there was a preexisting county franchise, however, PG&E's predecessors clearly were providing lighting to Madera after incorporation but during the constitutional period.

[17]PG&E asserted that in Fairfield the board of trustees gave Leonard Prior a franchise to set up a lighting and power system in the town. Plaintiffs do not question the accuracy of this statement, but the record discloses that it was the county board of supervisors that granted the franchise in 1901, before the town was incorporated.

[18]The record also indicates that before the incorporation of Fowler and Santa Maria, the board of supervisors in their respective counties granted a lighting franchise to PG&E's predecessor. However, as to these cities plaintiffs do not object that PG&E's predecessor had only a county franchise.

[19]W.J. Martin originally obtained an electric franchise from San Mateo County for the South San Francisco Power & Light Company.

Power Company to Western States Gas & Electric Co., PG&E's immediate predecessor in several cities. The indenture on that date does not specifically describe any lighting franchise in Arcata, but identifies certain parcels and includes "all franchises . . . poles, pole lines, wires . . . and all other personal property . . . which *may* belong to [Arcata Light & Power Company], or in which it *may* have any interest." (Italics added.) While such generality is sufficient to show the *transfer* of an established franchise, it cannot alone create a basis for presuming that the grantor had a lighting franchise to convey.

In Ferndale PG&E's evidence included indenture agreements between Ferndale Electric Light Co. and two citizens. The first, executed in March 1905, allowed the company water rights for the use of its "Electric Light Plant only" and a right of way across the grantor's private property to lay pipes to conduct the water. The second, executed in December 1899, conveyed a right of way to the company to lay conduits for transmitting electricity over a certain parcel. Neither of these agreements affirmatively demonstrated that Ferndale Electric Light Co. obtained these rights in order to serve this city or its residents with light. The subsequent conveyance from Ferndale Electric Light Co. to Western States Gas & Electric Co. on August 4, 1911 employed a standard indenture form like that used in Arcata; it contained no recital of fact permitting the inference that the grantor was transferring a lighting business in the city of Ferndale.

The evidence pertaining to Sanger suffers from similar limitations. In April 1909, prior to the city's incorporation, C.M. Blackman conveyed to A.G. Wishon certain property connected with the "electric light works" in Sanger. The next document is an authorization to draw a warrant in favor of the San Joaquin Light & Power Corp., with no connection to the previous service provider. The purpose of the payment is not specified and the authorization occurs in December 1911, after the amendment of article XI, section 19. The undisputed evidence in Sanger, like Arcata and Ferndale, is insufficient to establish PG&E's entitlement to judgment as à matter of law.

### Conclusion

PG&E's moving papers established its constitutional franchise in 56 cities. As to those class members, plaintiffs failed to adduce evidence raising a triable issue of fact. In the following cities, however, there remain factual issues requiring resolution by trial: Arcata, Colusa, Dinuba, Emeryville, Ferndale, Fortuna, Lemoore, Los Banos, Paso Robles, Red Bluff, Sanger, Sausalito, Sonoma, and Vacaville.

This holding should not be interpreted to mean that no substantial evidence exists to support PG&E's position. It may turn out that PG&E easily

defends against plaintiffs' complaint on the ground that it holds a constitutional franchise in these cities. Such an outcome, however, is for the trier of fact, not this court, to decide. Our function in a summary judgment proceeding is limited to issue finding, not issue determination, and we must resolve all doubts against the motion. (*Mann v. Cracchiolo* (1985) 38 Cal.3d 18, 36 [210 Cal.Rptr. 762, 694 P.2d 1134]; *Soderberg v. McKinney*, *supra*, 44 Cal.App.4th 1760, 1764-1765.) Consequently, the principles governing summary judgment compel the conclusion that as to those 14 cities material factual issues preclude the entry of judgment as a matter of law.

## Disposition

The judgment against Arcata, Colusa, Dinuba, Emeryville, Ferndale, Fortuna, Lemoore, Los Banos, Paso Robles, Red Bluff, Sanger, Sausalito, Sonoma, and Vacaville is reversed. As to the remaining appellants, the judgment is affirmed. Costs on appeal are awarded to plaintiffs.

Cottle, P. J., and Mihara, J., concurred.