Filed 6/25/26  The Protect Our Communities Foundation v. City of San Deigo CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| THE PROTECT OUR COMMUNITIES FOUNDATION, | D083588 |
| Plaintiff and Appellant, | |
| v. | (Super. Ct. No. 37-2021-00029833-CU-WM-CTL) |
| CITY OF SAN DIEGO, | |
| Defendant and Appellant; | ORDER MODIFYING OPINION AND DENYING REHEARING |
| SAN DIEGO GAS & ELECTRIC COMPANY, | NO CHANGE IN JUDGMENT |
| Real Party in Interest and Appellant. | |

THE COURT:

It is ordered that the opinion filed May 26, 2026, be modified as follows:

On page 3, the first sentence under the heading is deleted and replaced with the following:

> In 1920, San Diego Consolidated Gas & Electric Company entered gas and electric franchise agreements with the City and became the City's provider of gas and electricity for a 50-year term.  In 1940, San Diego Consolidated Gas &

Electric Company changed its name to San Diego Gas & Electric Company.

On page 27, after the last sentence of the second full paragraph, add as footnote 20 the following footnote, which will require renumbering of all subsequent footnotes:

Since the filing of this opinion, the Second District issued its opinion in *Nguyen v. City of Los Angeles* (June 22, 2026, B340105) ___ Cal.App.5th ___ [2026 Cal.App. Lexis 377]. Having reviewed this opinion, we do not believe it affects the conclusions reached here.

There is no change in the judgment.

The petition for rehearing is denied.

DATO, Acting P. J.

Copies to:  All parties

Filed 5/26/26  The Protect Our Communities Foundation v. City of San Deigo CA4/1

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PROTECT OUR COMMUNITIES FOUNDATION,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>CITY OF SAN DIEGO,<br><br>    Defendant and Appellant;<br><br>SAN DIEGO GAS & ELECTRIC COMPANY,<br><br>    Real Party in Interest and Appellant. | D083588<br><br><br>(Super. Ct. No. 37-2021-00029833-CU-WM-CTL) |

APPEAL from orders of the Superior Court of San Diego County, Katherine A. Bacal, Judge.  Affirmed.

Shute, Mihaly & Weinberger, Winter King; Malinda R. Dickenson for Plaintiff and Appellant The Protect Our Communities Foundation.

Mara W. Elliott and Heather Ferbert, City Attorneys, M. Travis Phelps, Assistant City Attorney, and Matthew Zollman, Deputy City Attorney, for Defendant and Appellant City of San Diego.

Gibson, Dunn & Crutcher, David A. Battaglia, Maurice Suh, James L. Zelenay, Jr., Peter S. Modlin, Blaine H. Evanson and Zachary C. Freund for Real Party in Interest and Appellant.

## I.  INTRODUCTION

The Protect Our Communities Foundation (POCF)[1] challenges the City of San Diego's (the City) award of gas and electric franchises (the franchises) to real party in interest San Diego Gas & Electric Company (SDG&E).  POCF contends the City's approval of the franchises and associated agreements violated the Constitution of the State of California, the San Diego City Charter (the Charter), and the California Environmental Quality Act (CEQA, Pub. Resources Code, § 21000 et seq.).  Specifically, it argues the trial court erred:  (1) by rejecting POCF's claims that the City's invitation to bid process violated the Charter's requirements for open competition and public bidding; (2) in ruling that certain surcharges were not "taxes" subject to Proposition 26; and (3) by rejecting POCF's claim that the City was required to conduct an environmental review under CEQA.

The City and SDG&E cross-appeal the trial court's grant of a writ of mandate severing from the franchise agreements provisions requiring that any decision to void the franchises before the end of their term be approved by a two-thirds majority of the San Diego City Council (City Council), instead of a bare majority.

As we explain below, we first conclude that POCF did not meet its burden to prove that the City violated the Charter's requirements for

---

[1]    According to its petition, POCF is a nonprofit public benefit corporation and "represents the interests of San Diego and Southern California residential ratepayers in proceedings before the California Public Utilities Commission and other California agencies and in the courts."

competitive bidding for the franchises.  Accordingly, the trial court properly denied POCF's third cause of action for a writ of mandate directing the City to void its approvals of the franchise ordinances.  We further hold that the four challenged surcharges that are embedded in the franchise ordinances fall within an exemption to the requirements of Proposition 26 and are therefore not unconstitutional taxes; that the plain language of the Charter precludes the franchise ordinances' requirement that a two-thirds vote of the City Council would be necessary to terminate the franchises; and that the award of the franchises did not constitute a project for purposes of CEQA, and therefore the City properly concluded that CEQA did not apply to the award of these franchises.  The orders are affirmed.

## II.   FACTUAL AND PROCEDURAL BACKGROUND[2]

In 1920, SDG&E entered gas and electric franchise agreements with the City and became the City's provider of gas and electricity for a 50-year term.  In 1970, SDG&E entered new agreements with the City for another 50-year term, ending in 2020.  In September 2020, in anticipation of the expiration of those franchise agreements, then-Mayor Kevin Faulconer issued an invitation to bid for new gas and electric franchise agreements, inviting any qualified company to bid.  In December 2020, the City Council opened the bids and SDG&E was revealed to be the sole bidder.  The City's new mayor, Todd Gloria, reviewed SDG&E's bids, declared them nonresponsive "based on the exceptions contained to the material terms," and cancelled the initial bidding process.  The City extended the then-existing franchises for 135 days.

In March 2021, Mayor Gloria issued new invitations for any qualified company to bid on the gas and electric franchises.  These invitations to bid

---

[2]    This section provides a general background regarding the litigation. The facts related to the specific claims at issue in this appeal will be discussed in section III, *post*.

3

provided 20-year terms for both the gas and electric franchises but divided those terms into an initial term of ten years followed by a ten-year conditional extension. In April 2021, the City Council unsealed the bids and SDG&E was once again the sole bidder for both franchises. After negotiations, the City and SDG&E agreed on the terms of the franchise agreements, which were then put before the City Council for approval. The City and SDG&E also reached agreement on the terms of an energy cooperation agreement, an administrative memorandum of understanding (MOU), and an undergrounding MOU.

Thereafter, the City concluded that awarding the franchises to SDG&E constituted "a fiscal and administrative activity of a government that will not result in a direct or indirect physical change in the environment," and thus "is not subject to CEQA pursuant to CEQA Guidelines Section 15060(c)(3)."[3] Alternatively, it found the franchise agreements were exempt from CEQA under CEQA Guidelines section 15301, subdivision (b), which exempts existing utility facilities.

In May 2021, the City Council voted and approved the proposed franchise agreements between the City and SDG&E. In June 2021, the City Council formally approved two resolutions that had been voted on at the May meeting.[4] The City Council adopted the franchise agreements—ordinance

---

[3]     "CEQA is implemented by an extensive series of administrative regulations promulgated by the Secretary of the Natural Resources Agency, ordinarily referred to as the 'CEQA Guidelines.' " (*Union of Medical Marijuana Patients, Inc. v. City of San Diego* (2019) 7 Cal.5th 1171, 1184 (*UMMP*).) The CEQA Guidelines are codified at title 14 of the California Code of Regulations section 15000 et seq.

[4]     The first resolution, resolution No. 313554, included findings that the City Council had determined the franchise agreements and energy

4

Nos. 21327 and 21328—and awarded SDG&E the electric and gas franchises with the City.

In November 2021, acting pursuant to express authority granted to the mayor by the City Council, the City and SDG&E executed the administrative MOU which established the general work requirements for SDG&E activities, including a requirement that SDG&E and its contractors comply with all applicable laws and City requirements. In March 2022, the City Council adopted by ordinance the undergrounding MOU between the City and SDG&E which established a protocol for the design, procurement, and construction necessary to convert SDG&E's electrical facilities to underground facilities.

In July 2021, POCF filed a verified petition for writ of mandate asserting four causes of action for alleged: (1) unlawful imposition of a special tax; (2) violations of competitive bidding mandates; (3) CEQA violations; and (4) impermissible delegation of police power. POCF requested an order voiding the City's approval of the franchises and related agreements. The trial court bifurcated the first cause of action for alleged CEQA violations and issued an order on December 23, 2022 (the December Order), denying the petition as to POCF's first cause of action. After a second hearing addressing the remaining causes of action, the trial court issued an order on October 10, 2023 (the October Order), denying the petition except with respect to one argument raised in support of POCF's second cause of

cooperation agreement were not subject to CEQA. The second resolution, resolution No. 313555, authorized the mayor to execute the energy cooperation agreement with SDG&E.

action (i.e., severing from the ordinances a two-thirds voting requirement).

All parties appealed.[5]

## III. DISCUSSION

### A. *THE CITY DID NOT VIOLATE ITS CHARTER'S COMPETITIVE BIDDING MANDATES*

#### 1. Additional Background

In 2020, the City issued invitations to bid for new gas and electric franchises. SDG&E bid on both franchises. In December 2020, Mayor Gloria determined SDG&E's bid to be unresponsive based on the exceptions to the material terms of the advertised franchises. Mayor Gloria canceled the then-pending invitations to bid and the City Council later entered into an agreement with SDG&E to extend the existing franchises to June 1, 2021.

In March 2021, Mayor Gloria issued new invitations to bid for the gas and electric franchises. The solicitations stated that "[t]he franchise may be awarded by introduction and adoption of an ordinance substantially in the form specified as either Exhibit A or Exhibit B attached hereto." The Exhibit A draft ordinance expressly stated that the grantee possessed a "certain franchise . . . acquired pursuant to section 19 of article XI of the Constitution of the State of California, as the section existed prior to its amendment on October 10, 1911." As we discuss below, such a "certain franchise" is known as a "constitutional franchise." The Exhibit B draft

---

5      We ordered the parties to submit briefing on whether the October Order was an appealable order. We later directed the appeal to proceed and allowed the parties to address appealability in their appellate briefing. All parties contend the October Order is appealable. We agree that the October Order, together with the December Order, are appealable as a final determination of the parties' rights which left no issue for future consideration except the fact of compliance or noncompliance with the terms of the orders. (*Dhillon v. John Muir Health* (2017) 2 Cal.5th 1109, 1115.)

6

ordinance was "for bidders who do not possess such a 'constitutional franchise' for lighting."[6]

In its third cause of action, POCF sought mandamus relief under Code of Civil Procedure section 1085, alleging the City violated competitive bidding mandates. POCF asserted the City had a ministerial duty under its charter to ensure all contracts were competitively bid. It argued that the City's invitations to bid violated public bidding requirements by adopting a two-tiered system—one ordinance for companies with a "constitutional franchise," and a separate ordinance for bidders lacking such a franchise. As a secondary argument, POCF also alleged that the invitations to bid violated public bidding requirements because, after the bids were unsealed, the ordinances adopted by the City modified the applicable criteria from those set forth in the ordinances attached as exhibits to the invitations to bid.

POCF claimed the invitations to bid contravened Charter section 94, which requires that contracts for the " 'construction, reconstruction or repair' " of public infrastructure—including roads, buildings, and utilities—must follow competitive bidding procedures established by ordinance. Contracts not complying with this provision are deemed void and unenforceable against the City. (Charter, art. VII, § 94.) POCF also cited section 100 of the Charter which prohibits any City officer or employee from giving preferential treatment to a bidder by providing selective information or withholding it, or from misleading bidders regarding the required materials or supplies; and Charter section 103, which requires that the City Council's grant of a franchise must be preceded by " 'an opportunity for free and open competition.' "

---

[6]  For ease of reference, we refer to Exhibit A bidders with a constitutional franchise as proceeding under "option A" and Exhibit B bidders as proceeding under "option B."

7

POCF maintained that "[c]ompanies with a constitutional franchise would start out with a competitive advantage to those who do not possess a constitutional franchise, because a city can neither charge money for a constitutional franchise nor may it terminate a constitutional franchise without compensation by granting an exclusive franchise to a different entity." It alleged that SDG&E did not in fact possess a constitutional franchise. Accordingly, it argued to the trial court that the City's references to a constitutional franchise improperly favored SDG&E and discouraged other entities from bidding because it signaled to possible bidders that SDG&E held property rights that could not be extinguished except through eminent domain proceedings.

POCF also argued that the City impermissibly provided SDG&E with veto authority over City policy. POCF claimed the City changed the structure of the administrative and undergrounding MOUs to give SDG&E veto power over the terms of agreements that had not yet been negotiated at the time the City approved the ordinances. POCF also noted SDG&E vetoed certain items in the invitations to bid, requiring that SDG&E: (1) comply with the City's objective to reduce greenhouse gas emissions to the fullest extent practical, eliminating the word "fullest"; (2) implement the "City's desire to accomplish the goals set forth in its Climate Action Plan dated December 2015, and any revised or successive climate plan," eliminating the term "and any revised or successive climate plan"; (3) expand distributed energy resources; and (4) replace terms reflecting the City's regulatory authority with an agreement "that a Superior Court judge or appellate court, not the City, will determine the contract terms for cost responsibility of all relocations of Grantee facilities necessitated by all City water projects from now until 2041."

8

In response, SDG&E claimed it possessed a constitutional franchise because it had provided utility services in the City since before October 10, 1911. It argued there was no favoritism; the ordinances merely reflected the reality that SDG&E held a constitutional franchise in San Diego, whereas other potential bidders did not. It did not address POCF's argument that the City impermissibly provided SDG&E with veto authority over City policy.

The trial court acknowledged the parties' dispute over whether SDG&E had a constitutional franchise but did not decide the issue. It concluded the City did not "tilt the playing field" in SDG&E's favor by acknowledging that SDG&E may be differently situated if it had a constitutional franchise. It also rejected the argument that requiring non-SDG&E bidders to either pay to acquire SDG&E's infrastructure or litigate with SDG&E created an uneven playing field. The court did not separately address each of POCF's arguments claiming the City improperly changed requirements established in the invitations to bid after bids were submitted. But the court indicated it had fully considered the written and oral arguments of all parties and the evidence presented. Finding no evidence that any bidder was deterred from submitting a bid because of anti-competitive procedures, the court denied the petition for writ of mandate.

2.  Analysis[7]

POCF contends the City's invitations to bid violated public bidding requirements because the City (1) improperly changed the requirements established in the invitations to bid after bids were submitted and (2) adopted a two-tiered system—one ordinance for companies with a constitutional franchise, and a separate ordinance for bidders lacking such a franchise. We provide the standards governing such claims, then address each in turn.

A writ of mandate compels a government official or agency to perform a legally required duty. (Code Civ. Proc., § 1085.) Courts may use this remedy not only for ministerial actions, but also for legislative or quasi-legislative acts. (*County of Los Angeles v. City of Los Angeles* (2013) 214 Cal.App.4th 643, 653.) In considering whether to issue the writ, a trial court must determine whether the agency had a mandatory duty that can be directly enforced or a policy-based duty subject to judicial deference. (*Ibid.*) This determination is typically reviewed independently by the court because it involves interpreting the law. (*Ibid.*) A ministerial act is one the law specifically requires an official to perform in a prescribed manner, without discretion. (*Ibid.*) In contrast, discretionary acts involve judgment or choice. (*Id.* at pp. 653–654.) Ordinarily, a writ of mandate cannot control how discretion is exercised, but it may issue to correct an abuse of discretion. (*Id.*

---

[7] After reviewing the record, we requested supplemental briefing from the parties regarding who had the burden of proving SDG&E had a constitutional franchise and whether the City had a good faith basis for believing SDG&E possessed a constitutional franchise. Assuming SDG&E did not have a constitutional franchise, we inquired whether the City acted arbitrarily and capriciously in setting up a bidding solicitation scheme that relied on that assumption and whether, to the extent the invitations to bid implied that some entity held a constitutional franchise, it was reasonable to assume this information would deter bidders.

at p. 654.)  Courts do not substitute their judgment for that of the agency. (*Ibid.*)  If reasonable people could differ about whether the agency's decision was wise, the agency's choice must stand.  (*Ibid.*)

A petitioner seeking mandate relief under Code of Civil Procedure section 1085 bears the burden of pleading and proving the facts establishing entitlement to relief.  (*California Correctional Peace Officers Assn. v. State Personnel Bd.* (1995) 10 Cal.4th 1133, 1153 (*Cal. Correctional Peace Officers*); Evid. Code, § 500 ["a party has the burden of proof as to each fact the existence or nonexistence of which is essential to the claim for relief or defense that he is asserting"].)  The definitional elements of a cause of action describe the minimum showing a petitioner must make to support a favorable judgment.  (*Beck Development Co. v. Southern Pacific Transportation Co.* (1996) 44 Cal.App.4th 1160, 1205.)  Accordingly, the petitioner must demonstrate the agency's decision was legally unreasonable or invalid as a matter of law.  (*Mike Moore's 24-Hour Towing v. City of San Diego* (1996) 45 Cal.App.4th 1294, 1306 (*Mike Moore's*).)

Competitive bidding requires that bids conform to the stated specifications, and bids that fail to do so are ordinarily ineligible for acceptance.  (*Ghilotti Construction Co. v. City of Richmond* (1996) 45 Cal.App.4th 897, 904 (*Ghilotti*).)  However, courts have long recognized that a bid may still be accepted if it substantially complies with the bidding requirements, even if it is not strictly responsive, so long as the deviation is inconsequential—that is, it did not affect the bid price or give the bidder an unfair advantage over others.  (*Ibid.*)  Whether a bid materially deviates from the specifications is a question of fact.  (*Id.* at p. 906.)

"A public entity's 'award of a contract, and all the acts leading up to the award, are legislative in character.' "  (*Mike Moore's, supra*, 45 Cal.App.4th at

11

p. 1303.) Judicial review under Code of Civil Procedure section 1085 is limited to whether the agency acted arbitrarily, capriciously, without evidentiary support, or in violation of public policy or procedural fairness. (*Mike Moore's*, at p. 1303.) These are legal questions, reviewed de novo on appeal unless factual disputes are involved. In that case, findings supported by substantial evidence will be upheld. (*Ibid.*)

a. Changed Bid Requirements

POCF contends that the invitations to bid violated competitive bidding requirements because the ordinances ultimately adopted by the City differed from the draft ordinances attached as exhibits to the invitations to bid. It reprises its arguments concerning alleged post-bid changes to the MOUs, the Climate Action Plan, and distributed energy resources. We reject the City and SDG&E's contention that POCF forfeited these arguments by not raising them in the trial court but agree the arguments lack merit.[8]

With respect to the MOUs, POCF argues the City impermissibly allowed post-bid changes that converted the administrative MOU into a negotiated document and limited the City's authority under the undergrounding MOU. POCF further asserts the City adopted ordinances that eliminated requirements contained in the exemplar ordinances attached to the invitations to bid, thereby misleading potential bidders and materially

_____

[8] POCF also argues on appeal that the renegotiated agreements changed: (1) the payment terms making it more difficult for the City to terminate the franchises; and (2) costs for liquidated damages and funding of employee bonuses favorable to SDG&E. POCF forfeited these arguments by failing to make them in the trial court. (*Hewlett-Packard Co. v. Oracle Corp.* (2021) 65 Cal.App.5th 506, 548.)

altering the competitive landscape after bids were unsealed.[9] POCF also claims the trial court failed to rule on these issues and requests we direct entry of judgment in its favor on this cause of action.

The record does not support POCF's assertion that the trial court failed to address these claims. The court expressly denied mandate relief on the third cause of action after stating it had "fully considered" all written and oral arguments. Under the doctrine of implied findings, we presume the trial court made all factual determinations necessary to support its ruling, so long as substantial evidence supports those determinations. (*Brewer v. Carter* (2013) 218 Cal.App.4th 1312, 1320.) Accordingly, we presume the court found that the post-bid changes were not material, did not mislead bidders, did not confer an unfair advantage, and did not violate competitive bidding requirements or the City Charter.

POCF's substantive argument—that the adopted ordinances materially deviated from the bid specifications—fails on the merits. The invitations to bid expressly stated that the franchises "may be awarded by introduction and adoption of an ordinance substantially in the form specified as either Exhibit A or Exhibit B attached hereto." By their plain terms, the invitations contemplated that the final ordinances would not be identical to the exemplar

_____

9      Specifically, POCF noted the adopted ordinances eliminated terms in the invitations to bid:  (1) requiring the franchisee to cooperate in good faith to attain the goals of the Climate Action Plan " 'and any revised or successive climate plan' " with the adopted ordinances eliminating the quoted language; (2) requiring that SDG&E eliminate greenhouse gases to the " 'fullest' " extent practical by deleting the quoted word; (3) requiring distributed energy systems permit excess energy be made available to other customers; (4) requiring SDG&E " 'not unreasonably oppose or obstruct' " mechanisms to support renewable energy by eliminating the quoted language; and (5) allowing the City to determine costs associated with relocated water projects and instead allowing courts to decide the issue.

13

ordinances, but only substantially similar. Competitive bidding law does not require absolute identity between bid specifications and the final contract particularly where, as here, the governing documents expressly allow for modification. (*Ghilotti, supra*, 45 Cal.App.4th at p. 904.)

The invitations to bid further reserved the City's right to negotiate changes to bid terms or to negotiate with the incumbent franchise holder to renew, extend, or replace the existing franchise. They also expressly contemplated post-bid negotiation of the energy cooperation agreement, directing bidders to submit narrative proposals addressing energy policy and identify desired terms and commitments. Bidders were specifically asked to describe any barriers to alignment with provisions of the exemplar ordinances, underscoring that deviations were anticipated and evaluated as part of the competitive process. Consistent with this framework, all proposals for the cooperation agreement were subject to acceptance, rejection, or modification by the mayor. SDG&E's successful bids expressly requested negotiations over specific ordinance language, precisely as the invitations to bid contemplated. Against this record, POCF's assertion that the City was bound to adopt the exemplar ordinances without deviation is untenable.

Finally, POCF presented no evidence that any bidder was deterred from submitting a bid, misled as to the bidding requirements, or placed at a competitive disadvantage because of the challenged changes. Although two entities initially expressed interest in the franchises, neither ultimately submitted a bid, and POCF offered no evidence explaining why they declined to do so. In the absence of a showing that any deviation materially affected price, competition, or the fairness of the bidding process, competitive bidding law does not prohibit the City's actions. What remains is nothing more than a disagreement with the City's policy choices and its exercise of discretion—

14

matters that are legislative in character and entitled to substantial judicial deference.[10] (*Mike Moore's, supra*, 45 Cal.App.4th at p. 1303.)

In sum, POCF failed to carry its burden of proving that the City violated competitive bidding requirements or breached a ministerial duty enforceable by writ of mandate. The record demonstrates that the bidding process expressly contemplated negotiation and modification, that any post-bid changes were within the scope of the invitations to bid, and that no bidder was misled or disadvantaged. Because POCF did not establish that the City acted arbitrarily, capriciously, or in violation of law, the trial court properly denied mandate relief on these claims.

### b. Constitutional Franchise

The trial court noted that the parties disagreed as to whether SDG&E possesses a constitutional franchise but did not resolve the dispute. The

---

10    POCF's reliance on *Baldwin-Lima-Hamilton Corp. v. Superior Court of San Francisco* (1962) 208 Cal.App.2d 803, *Konica Business Machines U.S.A., Inc. v. Regents of University of California* (1988) 206 Cal.App.3d 449, *Eel River Disposal and Resource Recovery, Inc. v. Humboldt* (2013) 221 Cal.App.4th 209, *DeSilva Gates Construction, LP v. Department of Transportation* (2015) 242 Cal.App.4th 1409, and *Valley Crest Landscape, Inc. v. City Council* (1996) 41 Cal.App.4th 1432 is misplaced because each involved a losing bidder claiming prejudice as a result of the governmental defendant's alleged failure to adhere to bid specifications. (*Baldwin-Lima,* at pp. 807–808, 822 [deviation from bid requirement that equipment be manufactured in the United States allowed winning bidder to beat plaintiff's price]; *Konica,* at pp. 451, 453–454, 457 [acceptance of bid that deviated from listed performance specifications for copiers put bidders in unfair position of having to guess what would satisfy defendant's needs]; *Eel River,* at pp. 214, 237 [changed criteria after bids were unsealed and introducing previously unknown factor disadvantaged all bidders except the one receiving franchise]; *DeSilva,* at pp. 1413, 1423–1424 [allowing correction of " 'material' " bid deviation while rejecting bid with no material deviation constituted an abuse of discretion]; *Valley Crest,* at pp. 1435, 1442–1443 [winning bidder received "unfair advantage" being allowed to correct material bid mistake after submission].)

15

parties fully litigated the issue, and it was central to the parties' arguments about the validity of the bidding process. On appeal, POCF argues that the separate bid terms gave SDG&E an unfair competitive advantage in the bidding process, alleging that SDG&E in fact did not have a constitutional franchise, and, further, that SDG&E presented no admissible evidence supporting its constitutional franchise claim. The City and SDG&E's combined respondent's brief does not address the issue at all, prompting us to request supplemental briefing. We therefore begin by clarifying what constitutes a constitutional franchise, then address which party bore the burden of proof on that issue and whether that burden was met.

Although not defined in the Charter, the term "franchise" generally refers to services that government is obligated to provide—such as water, gas, electricity, or telephone service—and the right to use public streets and ways to deliver those services to the public. (*Copt–Air v. City of San Diego* (1971) 15 Cal.App.3d 984, 987–988.) A franchise is conferred through a city's legislative authority. (*Pacific Rock etc. Co. v. City of Upland* (1967) 67 Cal.2d 666, 668.) It arises when a government authorizes private companies to place infrastructure on public property to deliver utilities across city streets and other public ways. (*Saathoff v. City of San Diego* (1995) 35 Cal.App.4th 697, 703–704 (*Saathoff*).)[11] A private utility's right to use public streets under a franchise is a property interest created by contract, namely the franchise agreement (*Southern Cal. Gas Co. v. City of Vernon* (1995) 41 Cal.App.4th 209, 218), "and a franchise fee is the purchase price of the franchise." (*Jacks v. City of Santa Barbara* (2017) 3 Cal.5th 248, 262 (*Jacks*).)

_____

[11]    Courts have also recognized that cities may grant franchises not only for traditional utilities but also for other public services, such as ambulance service, garbage collection, and cable television. (*Saathoff, supra,* 35 Cal.App.4th at p. 704.)

In contrast, a *constitutional franchise* derives from article XI, section 19, of the 1879 California Constitution, which allowed any person or company to acquire a constitutional franchise merely by installing infrastructure in public streets to provide artificial light—without the need for legislative approval. (*City of Santa Cruz v. Pacific Gas & Electric Co.* (2000) 82 Cal.App.4th 1167, 1171 (*Santa Cruz*).)[12] Once infrastructure was installed, the arrangement became a binding contract with the state and granted the provider a protected property interest. (*Id.* at pp. 1171–1172.) "[A]ny requirement of payment for this privilege or limitation on its duration was an invalid restriction." (*Id.* at pp. 1181–1182.) The existence of a constitutional franchise gives the franchisee the continuing authority to extend its infrastructure to new streets "so far as necessary to serve the municipality . . . ." (*Russell v. Sebastian* (1914) 233 U.S. 195, 210.)

Although the Constitution was amended in 1911 to eliminate this type of automatic franchise, the amendment did not affect entities that had already begun providing electricity for artificial light using city streets. (*Jacks, supra*, 3 Cal.5th at p. 264 ["The constitutional amendment did not

---

[12] As amended in 1884, article XI, section 19 stated as follows: " 'In any city where there are no public works owned and controlled by the municipality, for supplying the same with water or artificial light, any individual, or any company duly incorporated for such purpose under and by authority of the laws of this State, shall, under the direction of the Superintendent of Streets, or other officer in control thereof, and under such general regulations as the municipality may prescribe for damages and indemnity for damages, have the privilege of using the public streets and thoroughfares thereof, and of laying down pipes and conduits therein, and connections therewith, so far as may be necessary for introducing into and supplying such city and its inhabitants either with gaslight or other illuminating light, or with fresh water for domestic and all other purposes, upon the condition that the municipal government shall have the right to regulate the charges thereof.' " (*Santa Cruz, supra*, 82 Cal.App.4th at p. 1171.)

17

impair rights under existing constitutional franchises."]; *Santa Cruz, supra*, 82 Cal.App.4th at p. 1172.) Their rights remained intact, and they could continue providing electricity for lighting without being subject to new fees for doing so. (*Santa Cruz*, at p. 1172.) But to complicate matters, the infrastructure used to deliver electricity for lighting—such as poles and wires—also carried electricity for additional purposes, including heating and cooking. (*Ibid.*) To cover these non-lighting uses, entities holding constitutional franchises entered into separate agreements with municipalities. (*Ibid.*) These agreements, often referred to as "complementary" franchises, required the payment of fees for the continued use of public streets to supply electricity or gas for non-lighting services. (*Ibid.*)

POCF contends SDG&E had the burden of proving the existence of a constitutional franchise because the City and SDG&E asserted in their answers that they acted lawfully. The City and SDG&E counter that POCF alleged, as an element of its third cause of action, that SDG&E did not possess a constitutional franchise and POCF was therefore obliged to prove its non-existence. We agree with the City and SDG&E that POCF had the burden of proof on this issue.

The City structured the bidding process around whether a bidder possessed a constitutional franchise and awarded the franchise under the ordinance applicable to an entity asserting such a right. Whether SDG&E in fact possessed a constitutional franchise is therefore integral to POCF's claim that the bidding process violated competitive bidding mandates. POCF expressly alleged that SDG&E lacked a constitutional franchise and that the two-ordinance structure improperly conferred a competitive advantage. Because that allegation was essential to POCF's cause of action, POCF bore

18

the burden of proving it. (*Cal. Correctional Peace Officers, supra*, 10 Cal.4th at p. 1153.) POCF's attempt to shift the burden based on the City's and SDG&E's affirmative defenses is unavailing. An affirmative defense must raise a "new matter" not already placed at issue by the complaint. (Code Civ. Proc., § 431.30, subd. (b)(2); *State Farm Mut. Auto. Ins. Co. v. Superior Court* (1991) 228 Cal.App.3d 721, 725.) The defenses asserted here merely denied POCF's allegations and did not inject new factual issues. They therefore constituted a traverse, not a shifting of the burden of proof. (*Bevill v. Zoura* (1994) 27 Cal.App.4th 694, 698.)

POCF's alternative argument—that the burden should shift because the existence of a constitutional franchise was peculiarly within SDG&E's knowledge—fails both procedurally and substantively. Exceptions to Evidence Code section 500 are rare and narrowly construed. (*Sargent Fletcher, Inc. v. Able Corp.* (2003) 110 Cal.App.4th 1658, 1670.) Whether the traditional placement of the burden of proof should be modified depends on a multifactor analysis that includes the parties' comparative knowledge of the issue, the accessibility of relevant evidence, the policy consequences of a failure of proof, and the likelihood of the fact's existence or nonexistence. (*Lakin v. Watkins Associated Industries* (1993) 6 Cal.4th 644, 660–661.) POCF did not raise this theory in the trial court, did not address the *Lakin* factors on appeal, and identified no evidentiary record showing exclusive control of relevant documents by SDG&E or the City. The argument is therefore forfeited. (*People v. Accredited Surety & Casualty Co., Inc.* (2021) 65 Cal.App.5th 122, 132.)

POCF likewise forfeited three additional theories raised for the first time in supplemental briefing—that constitutional franchises were terminated in 1914, expired by 2011, or were negated by franchise fee

19

practices. Arguments not raised in the trial court or opening briefs may not be introduced at this stage. (*Hewlett-Packard Co. v. Oracle Corp., supra*, 65 Cal.App.5th at p. 548.)

In summary, POCF's challenge rises or falls on a factual premise it failed to prove. Its claim of an unlawful, anti-competitive bidding process depended entirely on the assertion that SDG&E lacked a constitutional franchise and therefore received an improper advantage. Because POCF bore—and failed to meet—the burden of proving that essential fact, the City's decision to structure the invitations to bid based on the possible existence of such a franchise cannot be deemed arbitrary, capricious, or legally invalid. Absent proof that the predicate assumption underlying the two-ordinance framework was false, there is no basis for concluding the City violated its competitive bidding obligations. The trial court therefore correctly denied the petition for writ of mandate.[13]

## B. *THE FOUR CHALLENGED SURCHARGES ARE NOT UNCONSTITUTIONAL TAXES*

### 1. Voter Initiatives

Through a series of ballot initiatives, California voters have modified the Constitution to regulate how local governments can impose taxes, fees, and other assessments. (*City of San Buenaventura v. United Water Conservation Dist.* (2017) 3 Cal.5th 1191, 1199 (*San Buenaventura*).) Proposition 13, the initial measure in this series, established article XIII A.[14] (*San Buenaventura*, at p. 1199.) Among other things, the initiative prohibits

---

[13] The City's opposed request to take judicial notice of nine City municipal ordinances and two documents filed with the California Secretary of State, filed on January 9, 2026, is denied.

[14] All references to articles are to the California Constitution.

counties, cities, and special districts from enacting any "special tax" without a two-thirds vote of the electorate, " ' "to prevent local governments from subverting its limitations." ' " (*Ibid.*)  However, courts consistently held that article XIII A did not restrict local governments from imposing " 'legitimate special assessments' "—charges on property owners to help defray the costs of local improvements that directly benefit their properties.  (*San Buenaventura*, at p. 1199.)

In 1996, voters passed Proposition 218 to further restrict a local government's use of such special assessments.  (*San Buenaventura, supra,* 3 Cal.5th at p. 1200.)  It expanded Proposition 13's protections by adding article XIII D, which introduced new limits on assessments, fees, and charges tied to property ownership.  (*San Buenaventura*, at p. 1200.)  This article requires that property-related charges must not exceed the proportional cost of the services provided to the property.  (*Ibid.*)  Proposition 218 also introduced article XIII C, which limits local governments' power to impose taxes by requiring voter approval for all such taxes.  (*San Buenaventura*, at p. 1200.)[15]  The term "tax" was not specifically defined in Proposition 218. (*Citizens for Fair REU Rates v. City of Redding* (2018) 6 Cal.5th 1, 11 (*REU Rates*).)

In 2010, Proposition 26 expanded article XIII C's reach by defining "tax" to include "any levy, charge, or exaction of any kind imposed by a local government . . . ."  (Art. XIII C, § 1, subd. (e); *San Buenaventura, supra,*

---

[15]    Article XIII C provides that "local government[s]" may not "impose . . . any general tax . . . until that tax is submitted to the electorate and approved by a majority vote" (art. XIII C, § 2, subd. (b)), and may not "impose . . . any special tax . . . until that tax is submitted to the electorate and approved by a two-thirds vote" (*id.*, § 2, subd. (d)).

3 Cal.5th at p. 1200.)[16] It imposes on the state or local government the burden of proving that any charge, levy, or assessment is not a tax (*Schmeer v. County of Los Angeles* (2013) 213 Cal.App.4th 1310, 1322) and includes seven enumerated exemptions to the definition of "tax" for certain types of exactions. (Art. XIII C, § 1, subd. (e)(1)–(7).) By definition, a charge meeting an exemption does not constitute a tax. (*REU Rates, supra*, 6 Cal.5th at p. 11.) Any local government levy, charge, or exaction that does not meet an exemption and lacks voter approval is an invalid and unconstitutional tax. (*Howard Jarvis Taxpayers Assn. v. Coachella Valley Water Dist.* (2025) 108 Cal.App.5th 485, 504.)

2. Additional Background

The City Council approved ordinance No. 21327 (awarding gas franchise) and ordinance No. 21328 (awarding electric franchise) to SDG&E.[17] Both ordinances imposed several surcharges that are at issue before us. First, both ordinances imposed a surcharge of 3 percent of SDG&E's gross receipts "as consideration therefor and as compensation for the use of the Streets of the City." For clarity, we will refer to this surcharge as the SDG&E surcharge. The ordinances also imposed a gas surcharge and an electric surcharge "to be levied solely on customers in the City . . . ."

---

[16] Proposition 26 observed that, despite Propositions 13 and 218, California taxes continued to rise. (*REU Rates, supra*, 6 Cal.5th at p. 11.) It also highlighted a growing trend in which lawmakers and local officials labeled new taxes as " ' "fees" ' " to bypass constitutional voter approval requirements. (*Ibid.*)

[17] Appellant's February 14, 2025, unopposed request for judicial notice of the 2002 electricity franchise award, ordinance No. O-19030, is granted. (Evid. Code, §§ 452, subds. (b) & (c), 453.)

Finally, the electrical ordinance imposed an undergrounding surcharge of 3.53 percent.

The parties do not dispute that these surcharges are a "levy, charge, or exaction . . . imposed by a local government . . . ." (Art. XIII C, § 1, subd. (e).) Our next step is to determine whether any of the exemptions apply.

POCF alleges that the four charges do not fall within any of the seven enumerated exemptions in subdivision (e) of section 1 of article XIII C. The City and SDG&E argue that exemptions 1 and 4 apply, and therefore the four charges are not a "tax" under Proposition 26. The trial court found that the City did not meet its burden of showing exemption 1 applied but had met its burden to show exemption 4 applied. Accordingly, the trial court denied the fourth cause of action for a writ of mandate, finding the City had "met their burden to show exemption 4 applies, such that the fees do not impose taxes and are not subject to constitutional requirements for taxes."

3. Analysis

As noted above, Proposition 26 places the burden on the local government, in this case the City, to establish by a preponderance of the evidence that an exemption applies. (Art. XIII C, § 1, subd. (e); *San Buenaventura, supra*, 3 Cal.5th at p. 1214.) We review independently whether the four charges qualify for an article XIII C, section 1, subdivision (e) exemption. (*Sutter's Place, Inc. v. City of San Jose* (2024) 104 Cal.App.5th 855, 863.) At issue here are exemptions 1 and 4, which provide: (1) a "charge imposed for a specific benefit conferred or privilege granted directly to the payor that is not provided to those not charged, and which does not exceed the reasonable costs to the local government of conferring the benefit or granting the privilege" (art. XIII C, § 1, subd. (e)(1)); and (4) a "charge imposed for entrance to or use of local government property,

23

or the purchase, rental, or lease of local government property" (*id.*, § 1, subd. (e)(4)).[18] The trial court found exemption 4 applied and denied the petition for writ of mandate on the fourth cause of action. We agree. Because exemption 4 applies, we do not reach exemption 1.

Exemption 4 applies to charges "imposed for entrance to or use of local government property, or the purchase, rental, or lease of local government property." (Art. XIII C, § 1, subd. (e)(4).) This exemption contains two distinct clauses: the first addresses entrance to or use of government property, and the second pertains to the purchase, rental, or lease of such property. The parties do not discuss the second clause, implicitly conceding it does not apply. (*See Westside Center Associates v. Safeway Stores 23, Inc.* (1996) 42 Cal.App.4th 507, 529 [party "effectively concedes" an issue by failing to address it in briefing].) Accordingly, our analysis focuses on the first clause.

Turning to the first clause—which exempts charges imposed for entering or using government property—the California Supreme Court addressed this clause in *Zolly v. City of Oakl*and (2022) 13 Cal.5th 780

---

18    The other five exemptions are for: (1) charges "imposed for a specific government service or product provided directly to the payor that is not provided to those not charged, and which does not exceed the reasonable costs to the local government of providing the service or product" (art. XIII C, § 1, subd. (e)(2)); (2) charges "imposed for the reasonable regulatory costs to a local government for issuing licenses and permits, performing investigations, inspections, and audits, enforcing agricultural marketing orders, and the administrative enforcement and adjudication thereof" (*id.*, § 1, subd. (e)(3)); (3) fines, penalties, or other monetary charges "imposed by the judicial branch of government or a local government, as a result of a violation of law" (*id.*, § 1, subd. (e)(5)); and (4) charges "imposed as a condition of property development" (*id.*, § 1, subd. (e)(6)); and (5) "[a]ssessments and property-related fees imposed in accordance with the provisions of Article [13]D." (*Id.*, § 1, subd. (e)(7).)

(*Zolly*). There, the City of Oakland (Oakland) granted private waste haulers the right to operate on public streets and property and required them to pay franchise fees. (*Id.* at p. 784.) The Supreme Court granted review to determine whether those franchise fees constituted taxes under Proposition 26. (*Zolly*, at p. 784.)

Addressing the first clause of exemption 4, which exempts charges " 'imposed for entrance to or use of local government property,' " the court in *Zolly* concluded this exemption applies only to charges for the physical use of property that the payor may enter or use. (*Zolly, supra*, 13 Cal.5th at pp. 792–794.) Oakland, however, had not shown that the haulers paid the fees in exchange for any specific use of government property unavailable to the public. (*Id.* at p. 794.) This is a fact-specific requirement that focuses "on the actual benefit exchanged between the payor and local government." (*Ibid.*)

POCF contends this exemption does not apply because City ratepayers obtaining electricity or gas from SDG&E pay the four charges, not SDG&E. The City and SDG&E do not dispute that the four charges are passed on to ratepayers; rather they argue that the Supreme Court in *Zolly, supra*, 13 Cal.5th 780 properly characterized *Jacks, supra*, 3 Cal.5th 248 and *Mahon v. City of San Diego* (2020) 57 Cal.App.5th 681 as examples of payments by a utility in exchange for a property interest even though these fees are passed through to ratepayers. (*Zolly,* at p. 795.) The trial court agreed with the City and SDG&E. We agree with the result, but our approach is more nuanced.

The first clause of exemption 4 applies to charges "imposed for entrance to or use of local government property." (Art. XIII C, § 1, subd. (e)(4).) The record is clear that the four charges enable SDG&E to use local government property in a manner that is not available to the general public. The

25

ordinances expressly grant SDG&E the right to install, maintain, and use "facilities," "pipes," "wires," "conduits," and "appurtenances" in the public rights-of-way—in effect, granting SDG&E an easement above, along, and below City streets. These are rights uniquely conferred on SDG&E as the franchisee.

At the same time, City ratepayers who obtain electricity or gas from SDG&E, also receive concrete benefits derived from the use of City property in exchange for paying the four charges. Gas and electricity cannot be delivered to homes and businesses without the infrastructure "under or over" City streets. Thus, ratepayers benefit directly from the use of City streets, even though they do not themselves install or maintain the infrastructure.

The fact the four charges are paid as part of the franchise ordinances with SDG&E does not alter this analysis. Ratepayers receive electricity and gas flowing "under or over" City streets and into their homes and businesses—benefits they would not receive absent payment of the SDG&E surcharge and the gas and electric surcharges. (*Zolly, supra*, 13 Cal.5th at p. 794.) Ratepayers likewise benefit from the undergrounding surcharge. Underground electrical lines are far less vulnerable to wind, falling trees, vehicle collisions, and severe weather. As a result, ratepayers experience fewer outages and faster restoration times—benefits of particular importance to businesses and medically vulnerable residents. Undergrounding also reduces wildfire ignition risk, a substantial public safety benefit in fire-prone regions, and improves neighborhood aesthetics, which is associated with increased property values.

We do not interpret the phrase "use of local government property" in exemption 4 to require that the ratepayer must have the right to dig up a street and install infrastructure in the same manner as the streets might be

26

used by a franchisee. *Zolly* instructs courts to look beyond formal labels and focus instead "on the actual benefit exchanged." (*Zolly, supra*, 13 Cal.5th at p. 794.) Without the use of City's streets to deliver gas and electricity, ratepayers could not operate appliances, heat or cool their homes, or conduct ordinary business activities dependent on utility service. The ordinary meaning of "use" encompasses employing property to accomplish a purpose or availing oneself of its function even without physical alteration. (See, e.g., Black's Law Dict. (12th ed. 2024) ["To employ for the accomplishment of a purpose; to avail oneself of"].)

We conclude the City has met its burden of establishing that the four charges are exempt under exemption 4. Whether SDG&E or ratepayers are classified as the payors of the four charges, both benefit from use of local government property, all that is needed for exemption 4 to apply.[19]

Further, whether the four charges are viewed as imposed on SDG&E or passed through to ratepayers, the record demonstrates a direct exchange of value for the use of local government property. The City therefore met its burden of establishing that the four charges fall within exemption 4 of article XIII C, section 1, subdivision (e). Because the charges qualify for exemption 4, they are not "taxes" within the meaning of Proposition 26 and are not subject to its voter-approval requirements. The trial court properly

---

[19]    In its argument headings and substantive discussion of exemption 4, POCF did not contend that the trial court was required to make an express finding regarding the applicability of the final paragraph of article XIII C, section 1, subdivision (e) to this exemption. The contention is therefore forfeited, and we decline to consider whether that paragraph applies to exemption 4. (Cal. Rules of Court, rule 8.204(a)(1)(B); *Dilbert v. Newsom* (2024) 101 Cal.App.5th 317, 323 ["When a party fails to place an argument under a proper heading or subheading, we need not consider the issue."].)

27

denied the petition for writ of mandate on the fourth cause of action, and we affirm that ruling.

## C. *THE TRIAL COURT CORRECTLY INTERPRETED THE CITY CHARTER IN ORDERING THE SEVERANCE OF THE TWO-THIRDS VOTING REQUIREMENT*

1. Additional Background

The invitations to bid specified that the franchises would be awarded pursuant to Charter section 103. That section requires approval of franchises by a two-thirds vote of the City Council.[20] The ordinances further provided that a two-thirds vote of the City Council would be required to *terminate* the franchises after 10 years for reasons other than municipalization.

Among other things, POCF alleged in its second cause of action that by requiring a two-thirds vote to terminate the franchises after 10 years, the City Council impermissibly violated Charter section 15. The trial court agreed.

Specifically, the trial court held that the City's decision to impose a two-thirds voting requirement on franchise termination violated the express terms of Charter section 15.[21] It granted the petition for writ of mandate in

---

[20] Charter section 103 provides, in relevant part: " 'The Council shall have power to grant to any person, firm or corporation, franchises, and all renewals, extensions and amendments thereof, for the use of any public property under the jurisdiction of the City. Such grants shall be made by ordinance adopted by vote of two-thirds (2/3) of the members of the Council and only after recommendations thereon have been made by the Manager and an opportunity for free and open competition and for public hearings have been given. . . .' " (Charter, art. VII, ¶103.)

[21] Charter section 15 provides: "A majority of the members elected to the Council shall constitute a quorum to do business, but a less number may adjourn from time to time and compel the attendance of absent members in such manner and under such penalties as may be prescribed by ordinance.

part and severed the provisions requiring that any decision to void the franchises before the end of their term be approved by a two-thirds majority of the City Council, instead of a bare majority.

The City and SDG&E cross-appeal from that portion of the court's order. They assert the trial court misread Charter section 15 because that section says nothing about whether, when, or under what circumstances the City Council may adopt a supermajority voting threshold for future Council action.

2. Analysis

A city charter serves as the highest form of law for the city, subordinate only to the U.S. and California Constitutions and any overriding state legislation. (*Domar Electric, Inc. v. City of Los Angeles* (1994) 9 Cal.4th 161, 170 (*Domar*).) A charter city is bound to follow its charter, and any action that contradicts or fails to adhere to the charter is void. (*Id.* at p. 171.) We interpret a city charter using the same principles that apply to statutory interpretation, with the central aim of identifying and carrying out the legislative intent. (*Id.* at pp. 171–172.) We start with the charter's language and apply its ordinary meaning. If the wording is unambiguous, we cannot rewrite or expand it to serve an objective not evident from the text or legislative history. (*Id.* at p. 172.) "While we apply our independent judgment in construing a city charter, '[a]dministrative interpretations [of city charter provisions] of longstanding are entitled to great weight unless

---

*Except as otherwise provided herein the affirmative vote of a majority of the members elected to the Council shall be necessary to adopt any ordinance, resolution, order or vote*; except that a vote to adjourn, or regarding the attendance of absent members, may be adopted by a majority of the members present. No member shall be excused from voting except on matters involving the consideration of his own official conduct or in which his own personal interests are involved." (Charter, art. III, ¶15, italics added.)

29

they are plainly wrong.' " (*Lozano v. City of Los Angeles* (2022) 73 Cal.App.5th 711, 724.)

Starting with its plain language, Charter section 15 states, in part, that "[e]xcept as otherwise provided herein the affirmative vote of a majority of the members elected to the Council shall be necessary to adopt any ordinance, resolution, order or vote . . . ." Where, as here, the City Council was considering the adoption of the ordinances, unless the Charter provides otherwise, under the plain language of Charter section 15, a majority vote of the City Council members is required. Charter section 103 "otherwise provide[s]" that a larger, two-thirds "supermajority" would be required to grant, renew, extend or amend a franchise; but Charter section 103 does not include the termination of a franchise. Therefore, under the plain language of Charter section 15, only a majority vote would be needed for such termination.

Charter section 15 is not itself ambiguous; but as noted above, we further consider whether the text shows us a different objective.

Charter section 15 appears in article III of the Charter. That article addresses the legislative power of the City Council, including the term and duties of council members (section 12), council rules (section 14), and the provision that a "quorum" consists of "[a] majority of the members elected to the Council . . . ." (section 15). A "quorum" is defined as "the minimum number of members . . . who must be present for a deliberative assembly to legally transact business." (Black's Law Dict. (12th ed. 2024) p. 1509.)

Considered as a whole, we conclude that the functions of Charter section 15 are to define a quorum; to specify the standard vote threshold (a majority of City Council members); and to provide guidance on dealing with the problem that would arise if a quorum were lacking (i.e., a majority of

30

Council members are not present) by allowing the City Council to act on the quorum problem (because without a quorum, a majority vote would be impossible). These functions are consistent with the plain language in Charter section 15 and do not demonstrate any ambiguity.

The City and SDG&E argue that Charter section 15 sets minimum vote thresholds for valid action and does not establish a voting ceiling (the maximum number of votes required to act) or otherwise prevent the City Council from voting to implement higher vote thresholds in its discretion.

In support of this interpretation, the City and SDG&E point to Municipal Code section 22.0101, rule 7.3.2(b), which provides that the city attorney include in a proposed ordinance "whether a supermajority vote of the Council is required for its passage." We do not read this Municipal Code section as conferring legislative discretion to create supermajority requirements for future City Council action; instead, it merely ensures that ordinances are clear about whether a supermajority vote will be required for the adoption of the ordinance (e.g., the award of a franchise under Charter section 103) and which actions would not require a supermajority (all matters "otherwise provided [in the Charter])."

The City and SDG&E also point to various procedural rules in the Municipal Code that require a supermajority. For example, if the City Council wishes to reconsider a vote on a noticed matter, a two-thirds vote to suspend the Rules of Council is required before the City Council can vote on the motion to reconsider. (Mun. Code, § 22.0101, rule 2.12.1(c)(3).) But a procedural provision in the Municipal Code cannot supersede a substantive provision in the Charter. As noted above, the Charter is the City's highest form of law; Municipal Code provisions cannot take precedence over Charter provisions. (*Domar, supra*, 9 Cal.4th at p. 170.) Further, it is not argued

31

that the Municipal Code procedural provisions contradict any specific provisions of the Charter.

The City and SDG&E contend that "[n]othing forbids the Council from determining . . . that certain actions be undertaken only after approved by a supermajority [vote]." They argue the City can choose to impose a higher burden on itself than provided by Charter section 15. But the City can always exceed the majority vote requirement if it wishes; no doubt the City Council members vote unanimously on matters before it from time to time. The question is whether today's City Council can bind a *future* City Council to a supermajority vote in a situation in which the Charter does not provide for it (such as on a vote to terminate a franchise). We think it cannot.

Case law also casts doubt on the "minimum vote" argument. In *Howard Jarvis Taxpayers Assn. v. City of San Diego* (2004) 120 Cal.App.4th 374 (*Howard Jarvis*), the court considered a similar argument, concluding that where the state Constitution required only a majority vote to amend a Charter, a ballot proposition could not require a supermajority to do so. Plaintiff there had argued that the proposition did not violate the constitutional requirement for a majority vote because the majority vote requirement simply meant that the tax would be unconstitutional if it wasn't approved by "at least" a majority vote, and a two-thirds vote did not fall below that threshold. (*Id.* at p. 392.)

The court rejected this argument, concluding that the language ("approved by a majority vote") "clearly and unambiguously means that approval of a local government's imposition or increase of any general tax requires only a majority vote, and a two-thirds vote cannot be required for such approval." (*Howard Jarvis, supra*, 120 Cal.App.4th at pp. 392–393.) The court further commented, "[h]ad the drafters of article XIII C intended

32

the term 'majority vote' to mean '*at least* a majority vote' or a 'majority vote, *including a two-thirds vote at the election of the electorate*,' they easily could have done so." (*Ibid.*) Instead, looking at the language of article XIII C, the court found that "majority vote" and "two-thirds vote" should "be treated as separate and distinct voting requirements." (*Howard Jarvis,* at pp. 392–393.)

So too here. In more than a dozen places the Charter requires a two-thirds vote for City Council action. The majority vote requirement in Charter section 15 is separate and distinct from the supermajority requirements found elsewhere in the Charter. To paraphrase the *Howard Jarvis* case, had the drafters of Charter section 15 "intended the term 'majority vote' to mean '*at least* a majority vote' or a 'majority vote, *including a two-thirds vote at the election of the* [*City Council*],' they easily could have done so." (*Howard Jarvis, supra*, 120 Cal.App.4th at pp. 392–393.)

The City and SDG&E argue alternatively that a City Council determination to terminate a franchise falls within Charter section 103's provision for a two-thirds vote for "amendments" to a franchise. However, if the City Council voted to terminate the franchises, it would not be amending the franchises in any way. Nothing about the ordinances would be "amended" or changed by the vote. The ordinances contemplate possible termination and none of their language would need to be amended for the City Council to be able to terminate them.

Accordingly, our independent review satisfies us that the trial court did not err in ordering the severance of the two-thirds requirement for termination from the balance of the ordinances.

## D. *THE CITY CORRECTLY CONCLUDED THAT CEQA DID NOT APPLY TO THE ORDINANCES, AND THEREFORE THE TRIAL COURT DID NOT ERR IN DENYING THE CEQA CAUSE OF ACTION*

### 1. Additional Background

In May 2021, the City's planning department sent a memorandum to the mayor's office, setting forth its conclusion that the award of the franchises to SDG&E was not subject to CEQA. Following a public meeting and discussion, the City Council voted and approved the proposed franchise agreements. The City Council later issued a resolution concluding that CEQA review was unnecessary and adopted the two ordinances awarding the gas and electric franchises to SDG&E. The City later filed a notice of exemption with the San Diego County Clerk reflecting the City Council's determination that the franchise agreements were exempt from CEQA.

In its petition, POCF alleged the City applied an improper legal standard when it determined the ordinances were not subject to CEQA. The trial court bifurcated the hearing for the CEQA claims from the remaining claims. Relying on *UMMP, supra*, 7 Cal.5th 1171, the court concluded that the ordinances constituted a project for purposes of CEQA, because they allowed SDG&E to construct, maintain, and use pipes, poles, wires and appurtenances to distribute gas and electricity, and therefore it was reasonably foreseeable that the ordinances could result in new construction causing environmental change. Nonetheless, the court concluded the ordinances were categorically exempt from environmental review under the "existing facilities" exemption (CEQA Guidelines, § 15301; *id.*, § 15300.2, subd. (c)) and denied the CEQA cause of action. As we explain below, we do not reach the analysis as to potential exemptions, because in our independent

34

review, we conclude the ordinances do not constitute a project for CEQA purposes.

2. Legal Principles

Under CEQA, we review the agency's actions (as opposed to the trial court's decision). (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 427.) Our inquiry extends only to whether there was a prejudicial abuse of discretion. (Pub. Resources Code, § 21168.5.) "Such an abuse is established 'if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence.'" (*Vineyard Area*, at pp. 426–427.) When our review requires us to interpret a statute, our primary goal is to determine the Legislature's intent to fulfill the purpose of the law. (*Coalition of Concerned Communities, Inc. v. City of Los Angeles* (2004) 34 Cal.4th 733, 737.)

Whether an activity constitutes a project under CEQA is a legal question "to be decided on 'undisputed data in the record on appeal.'" (*UMMP, supra*, 7 Cal.5th at p. 1198.) As with any CEQA provision, courts should interpret a "project" in a way that affords "the fullest possible protection to the environment within the reasonable scope of the statutory language." (CEQA Guidelines, § 15003, subd. (f); *Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 390.)

CEQA sets out a three-tier process to ensure that public agencies take environmental factors into account when making decisions. (*Muzzy Ranch Co. v. Solano County Airport Land Use Com*. (2007) 41 Cal.4th 372, 379–380.) "First, the agency must determine whether the proposed activity is subject to CEQA at all [i.e., whether the proposed activity constitutes a 'project']. Second, assuming CEQA is found to apply, the agency must decide whether

35

the activity qualifies for one of the many exemptions that excuse otherwise covered activities from CEQA's environmental review.  Finally, assuming no applicable exemption, the agency must undertake environmental review of the activity, the third tier." (*UMMP, supra*, 7 Cal.5th at p. 1185.)  When an activity does not meet the definition of a project, the agency is not required to conduct any additional CEQA review.  (*UMMP*, at pp. 1185–1186.)

The question of whether an activity is a CEQA project focuses on its general nature and type, not on whether it will ultimately affect the environment.  (*UMMP, supra*, 7 Cal.5th at pp. 1195–1196.)  A "project" is an activity undertaken, supported, or approved by a public agency that may cause either a direct physical change in the environment or a reasonably foreseeable indirect physical change in the environment.  (Pub. Resources Code, § 21065; see also CEQA Guidelines, § 15378, subd. (a).)  An effect is not considered reasonably foreseeable if there is no clear link between the activity and the change, or if the connection is too weak or speculative. (*UMMP*, at p. 1197.)

Relevant here, a CEQA project does *not* include "[t]he creation of government funding mechanisms or other government fiscal activities, which do not involve any commitment to any specific project which may result in a potentially significant physical impact on the environment." (CEQA Guidelines, § 15378, subd. (b)(4).)  The CEQA Guidelines further provide that " 'project' refers to the activity which is being approved and which may be subject to several discretionary approvals by governmental agencies," but "does not mean each separate governmental approval." (CEQA Guidelines, § 15378, subd. (c).)  " 'This definition ensures that the action reviewed under CEQA is not the approval itself but the development or other activities that will result from the approval.' " (*Citizens for a Megaplex-Free Alameda v.*

36

*City of Alameda* (2007) 149 Cal.App.4th 91, 106.) An "approval" of a project refers to "the decision by a public agency which commits the agency to a *definite course of action* in regard to a project intended to be carried out by any person." (CEQA Guidelines, § 15352, subd. (a), italics added.)

3. Analysis

POCF argues that the City's adoption of the ordinances and related agreements qualifies as a "project" under CEQA. According to POCF, these franchise approvals represent a binding long-term commitment that limits consideration of environmentally superior alternatives and creates a causal link sufficient to trigger CEQA review. We disagree.

As noted above, under CEQA, an "approval" refers to a decision by a public agency that commits it to a specific course of action regarding a project. (CEQA Guidelines, § 15352, subd. (a).) However, fiscal activities or funding mechanisms that do not involve a commitment to any specific undertaking with the potential for significant environmental impact are not considered "projects" under CEQA. (CEQA Guidelines, § 15378, subd. (b)(4).)

*UMMP, supra*, 7 Cal.5th 1171, illustrates this distinction. There, the court considered a zoning ordinance adopted by the City that allowed for the creation and operation of medical marijuana dispensaries. (*Id.* at pp. 1181–1182.) The court found the ordinance qualified as a CEQA "project" because the regulatory changes authorized a substantial number of new businesses and could foreseeably result in new commercial construction and altered citywide traffic patterns. (*UMMP*, at pp. 1197, 1199.) The necessary causal connection existed because the ordinance was a significant step toward establishing businesses likely to affect the environment. (*Id.* at p. 1199.)

In *UMMP*, the court contrasted *City of Livermore v. Local Agency Formation Com*. (1986) 184 Cal.App.3d 531 and *Kaufman & Broad-South*

37

*Bay, Inc. v. Morgan Hill Unified School Dist*. (1992) 9 Cal.App.4th 464 (*Kaufman*) as examples of what does and does not constitute a CEQA project. (*UMMP, supra*, 7 Cal.5th at p. 1197.)  In *City of Livermore*, a county agency revised its sphere of influence guidelines to allow development in open space and agricultural lands.  (*City of Livermore*, at pp. 542–543.)  Because CEQA defines "project" to include actions such as amending zoning ordinances or General Plans (CEQA Guidelines, § 15378, subd. (a)(1)) and excludes only continuing administrative activities unless applied to a specific instance (*id.*, § 15378, subd. (b)(2)), the court found the guideline revisions analogous to a General Plan amendment promoting future growth.  (*City of Livermore*, at p. 539.)  They therefore constituted a project requiring the preparation of an environmental impact report.  (*Ibid.*)

By contrast, in *Kaufman, supra*, 9 Cal.App.4th 464, the formation of a community facilities district to raise funds for potential future school needs was not a CEQA project.  (*Kaufman*, at p. 474.)  The court found no causal link between the community facilities district and school construction, noting it created no new demand, imposed no binding commitment, and left all future options open.  (*Id.* at pp. 474, 476.)  The court held that where funding measures alone are at issue, CEQA applies only if there is a binding commitment to spend in a specific manner—which was not the case there. (*Kaufman*, at p. 476.)

Like *UMMP, supra*, 7 Cal.5th 1171, POCF contends the franchise approvals in this case similarly commit the City to a long-term energy policy and authorize construction and energy delivery in a manner triggering CEQA review.  This comparison to *UMMP* is misplaced.  In *UMMP*, the zoning ordinance created a new regulatory framework that allowed for the establishment of entirely new businesses—medical marijuana dispensaries—

38

which, in turn, could foreseeably lead to new retail construction and changes to citywide traffic patterns. (*Id.* at pp. 1197, 1199.) The court found a sufficient causal connection between the zoning ordinance and the potential environmental effects, because the zoning ordinance was a necessary step toward business development that could affect the environment. (*Id.* at p. 1199.)

In contrast, the franchise approvals at issue here do not authorize new residential or commercial development, establish new land uses, or encourage population growth. They do not facilitate the creation of new businesses, nor do they change land use patterns or service areas. Like the community facilities district in *Kaufman, supra*, 9 Cal.App.4th 464, the franchise approvals merely establish a funding and administrative structure, without committing the City or SDG&E to any particular development or construction. Crucially, there is no causal link—either direct or reasonably foreseeable—between the City's approvals and any potential physical change in the environment. (*Id.* at p. 474.)

Although we can speculate as to the need for future infrastructure work by SDG&E, including possible extension of service to a new development or a need for major maintenance projects, any actual work will depend on independent factors, such as customer demand or changes in technology. As in *Kaufman*, the absence of a binding commitment or foreseeable environmental consequence defeats the claim that CEQA review is required. (See also *UMMP, supra*, 7 Cal.5th at p. 1197 [weak or speculative link between activity and the environmental change is not a reasonably foreseeable link].)

Indeed, SDG&E was already delivering gas and electric services to City residents prior to the new franchise agreements. The only material effect of

the approvals is to allow SDG&E to continue providing those services under revised terms. (CEQA Guidelines, § 15352, subd. (a).) POCF points to language in the ordinances allowing SDG&E to "construct" and "maintain" infrastructure. But the existence of this generic language does not mean construction is imminent or environmentally significant. The ordinances simply permit SDG&E to use existing infrastructure—or infrastructure "lawfully placed" in the future—within City streets, and it does so in a manner indistinguishable from SDG&E's historic operations. This language does not establish the existence of a "project" under CEQA because it contains no commitment to undertake any specific work. It is purely enabling language, authorizing SDG&E to continue lawfully using City streets for its infrastructure in the same manner it has historically done and setting the fiscal terms for such authorization—nothing more.

Further, and importantly, if and when any such work is proposed, the work will require its own separate regulatory approvals, including applicable CEQA approvals. The ordinances expressly require that any facilities or equipment constructed, maintained, used, or removed by SDG&E comply with "applicable law," including environmental protection laws. The administrative MOU underscores this point, stating it "does not supersede any CITY permits, permissions or other approvals [SDG&E] is required to obtain to perform Work as described in this MOU." Taken together, the provisions in the ordinances and administrative MOU foreclose any reasonable claim that the ordinances approve or commit the City to a project. They neither authorize specific construction nor exempt SDG&E from future permitting or environmental review for such future projects.

In summary, the franchise approvals maintain the status quo, do not compel or induce new construction, and lack the causal connection necessary

40

to trigger CEQA.  Requiring CEQA review now, based on undefined, speculative scenarios, would serve no practical purpose and would contravene CEQA's rule that it applies only when an activity may cause a reasonably foreseeable physical change in the environment.  (*Lake County Energy Council v. County of Lake* (1977) 70 Cal.App.3d 851, 854–855.)  The City's determination that CEQA does not apply is both legally sound and supported by substantial evidence.  Because we agree with the City that the franchise approvals do not qualify as a project under CEQA, we need not address whether they fall within an exemption from CEQA review.  Accordingly, the trial court correctly denied POCF's petition for a writ of mandate as to the CEQA cause of action.

## IV.    DISPOSITION

The orders are affirmed.  The City and SDG&E are entitled to their costs on appeal.

KELETY, J.

WE CONCUR:

DATO, Acting P.J.

BUCHANAN, J.

41